UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: **08-CV-81574-Marra-Johnson**

MORRIS C. BROWN,
Shareholders' Representative of
Seisint, Inc.,

      Petitioner,

v.

REED ELSEVIER, INC., a
Massachusetts corporation,

      Respondent.

_____/

```
FILED by    VT    D.C.
ELECTRONIC

    Dec. 30, 2008

     STEVEN M. LARIMORE
     CLERK U.S. DIST. CT.
     S.D. OF FLA. · MIAMI
```

## COMPLAINT AND PETITION FOR COURT-APPOINTED ARBITRATOR

COMES NOW the petitioner, MORRIS C. BROWN, as Shareholder's

Representative for the former owners of Seisint, Inc., and states as follows:

**I.    Parties**

1. Petitioner, MORRIS C. BROWN ("Petitioner"), is an individual residing in

Palm Beach County, Florida, and is acting in his capacity as Shareholder Representative

for the former shareholders, warrant holders and option holders of Seisint, Inc.

("Seisint"), who sold their various equity interests in Seisint to Reed Elsevier, Inc.

2. Respondent, REED ELSEVIER, INC. ("Respondent"), is a Massachusetts

corporation with its principal place of business in Newton, Massachusetts.

**II.    Jurisdiction and Venue**

3. The jurisdiction of this Court is invoked under 9 U.S.C. §§ 1 *et seq.* (in

particular, 9 U.S.C. § 5), and under 28 U.S.C. § 1332. The matter in controversy,

exclusive of interest and costs, exceeds $75,000.

1

Dockets.Justia.com

4. Venue is proper in this Court pursuant to Section 8.7 of the Merger Agreement executed by Brown and Reed Elsevier which states that disputes relating to the selection of arbitrators shall be adjudicated by the United States District Court for the Southern District of Florida.

### III.  General Allegations

5. On July 13, 2004, Petitioner and Respondent entered into a contract in writing whereby Seisint was to be merged with Respondent ("Merger Agreement"). A copy of the Merger Agreement is attached to this Petition as Exhibit "A."

6. The contract evidences a transaction involving interstate commerce, and thus application of the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.*, as shown by the following facts:

a. Respondent is the U.S. arm of a multinational corporation with its headquarters in London, United Kingdom, and Amsterdam, Netherlands. Respondent is engaged in interstate commerce, and has more than two hundred offices across the globe, with several offices in the United States. Respondent owns Lexis-Nexis, which is engaged in interstate commerce as a global provider of content-enabled workflow solutions to professionals.

b. The contract at issue provided for Respondent's merger with Seisint, which was engaged in interstate commerce as a provider of information management products and services. Prior to the merger, Seisint was owned by shareholders, warrant holders and option holders from various states. Respondent subsequently merged Seisint into Lexis-Nexis.

7. The contract includes an arbitration provision as follows:

2

If any dispute should arise between the parties hereto as to any matter covered by this Agreement, including any claim for indemnification pursuant to Section 8.2, 8.3 or with respect to any dispute arising pursuant to the Escrow Agreement, then, in lieu of any suit or action in regard to any such matter, the controversy shall be submitted to arbitration in the following manner:

The party desiring to submit such controversy shall give to the other party notice in writing, stating with specificity the matter upon which an award is desired and naming the arbitrator selected by such party. Within 10 days following the receipt of such notice, the other party shall give written notice to the party desiring such arbitration of the arbitrator selected by it. Thereafter, the two arbitrators so chosen shall select a third. If such two arbitrators are unable to agree upon a third arbitrator within 20 days from the naming of the second arbitrator, the third arbitrator shall be appointed, upon application of either of the parties hereto, by the United States District Court for the Southern District of Florida.

(Merger Agreement at § 8.7.)

8. Since executing the Merger Agreement, a dispute has arisen regarding one of the escrow funds established by the Merger Agreement, and Respondent's duties under the Merger Agreement.

9. Petitioner and Respondent were not able to resolve such dispute. As a result, Petitioner has submitted its claims to arbitration in accordance with Section 8.7 of the Merger Agreement.

10. On October 23, 2008, Petitioner served Defendant with a Notice of Arbitration, demanding arbitration of Petitioner's claims.

11. As required by the Merger Agreement, Petitioner included in the Notice of Arbitration his selection of The Honorable Gerald Mager as his choice for a party-appointed arbitrator.

12. On November 14, 2008, Petitioner received written notice from Judge Mager that Respondent had selected F. Carlton King, Jr. as its party-appointed arbitrator.

13. The Merger Agreement provides that the two arbitrators chosen by the parties to the arbitration shall choose a third arbitrator "within 20 days from the naming of the second arbitrator." (Merger Agreement § 8.7.) The arbitrators have made attempts to select a third arbitrator, and have exchanged names of possible arbitrators, but they have been unable to agree on a third arbitrator.

14. To date, more than twenty days have passed since Respondent named Mr. King as its choice for arbitrator, and Mr. King and Judge Mager are at an impasse as to the selection of the third arbitrator.

## IV. Request for Relief

WHEREFORE, Petitioner requests that this Court issue an order:

1.  Designating a third arbitrator for the dispute in question; and

2.  Granting Petitioner such other and further relief as this Court considers just and proper.

Dated: December 30, 2008       Respectfully submitted,

By: *Sashi B. Boruchow*
Stuart H. Singer, Esq.
Florida Bar No.: 0377325
Sashi B. Boruchow, Esq.
Florida Bar No.: 0389376
BOIES, SCHILLER & FLEXNER
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: 954-356-0011
FAX: 954-356-0022
*Attorneys for Petitioner*

4

# Exhibit A

AGREEMENT OF MERGER

BY AND AMONG

REED ELSEVIER INC.,

LNS ACQUISITION CORP.,

SEISINT, INC.

AND

THE SHAREHOLDERS' REPRESENTATIVE

Dated as of July 13, 2004

Exhibit "A"



# TABLE OF CONTENTS

Page

**ARTICLE I**     DEFINITIONS.................................................................................2
    Section 1.1     Acquired Companies.................................................................2
    Section 1.2     Acquired Subsidiaries.............................................................2
    Section 1.3     Acquisition Transaction..........................................................3
    Section 1.4     Aggregate Acquisition Amount.................................................3
    Section 1.5     Aggregate Company Option Exercise Proceeds....................3
    Section 1.6     Aggregate Company Warrant Exercise Proceeds...................3
    Section 1.7     Agreement................................................................................3
    Section 1.8     Articles of Merger...................................................................3
    Section 1.9     Available Cash at Closing.......................................................3
    Section 1.10     Cash Balance Plan...................................................................3
    Section 1.11     Certificates..............................................................................3
    Section 1.12     CFIUS......................................................................................3
    Section 1.13     Closing.....................................................................................4
    Section 1.14     Closing Date............................................................................4
    Section 1.15     Closing Date Acquisition Amount...........................................4
    Section 1.16     Code.........................................................................................4
    Section 1.17     Company..................................................................................4
    Section 1.18     Company Affiliate...................................................................4
    Section 1.19     Company Claim.......................................................................4
    Section 1.20     Company Common Stock.........................................................4
    Section 1.21     Company Dissenting Holder....................................................4
    Section 1.22     Company Employees................................................................4
    Section 1.23     Company ESOP........................................................................5
    Section 1.24     Company Financial Statements................................................5
    Section 1.25     Company Indemnified Parties..................................................5
    Section 1.26     Company Intellectual Property.................................................5
    Section 1.27     Company Option.......................................................................5
    Section 1.28     Company Preferred Stock.........................................................5

- i -

Section 1.29  Company Registered Intellectual Property. ........................................... 5
Section 1.30  Company Series A Preferred Stock. ...................................................... 5
Section 1.31  Company Series B Preferred Stock. ...................................................... 5
Section 1.32  Company Series C Preferred Stock. ...................................................... 6
Section 1.33  Company Shareholders. ........................................................................ 6
Section 1.34  Company Warrant. ................................................................................ 6
Section 1.35  Confidentiality Agreement. ................................................................. 6
Section 1.36  Consultants. .......................................................................................... 6
Section 1.37  Contracts. .............................................................................................. 6
Section 1.38  CP Litigation Assumption Date. .......................................................... 6
Section 1.39  CP Litigation Indemnification Escrow. ............................................... 6
Section 1.40  CP Litigation Indemnification Escrow Termination Date. .................. 7
Section 1.41  December 31 Audited Financial Statements. ........................................ 7
Section 1.42  Dissenting Shares. ................................................................................ 7
Section 1.43  Distributable Percentage. ..................................................................... 7
Section 1.44  D&O Insurance. .................................................................................... 7
Section 1.45  DOJ. ...................................................................................................... 7
Section 1.46  Domain Names. ..................................................................................... 7
Section 1.47  Effective Time. ...................................................................................... 7
Section 1.48  Employee Benefit Plan. ........................................................................ 7
Section 1.49  ERISA. .................................................................................................. 7
Section 1.50  Escrow Agent. ....................................................................................... 8
Section 1.51  Escrow Agreement. ............................................................................... 8
Section 1.52  Escrow Fund. ......................................................................................... 8
Section 1.53  Escrow Shareholders. ........................................................................... 8
Section 1.54  Exchange Agent. .................................................................................... 8
Section 1.55  Exon-Florio Amendment. ..................................................................... 8
Section 1.56  FBCA. ................................................................................................... 8
Section 1.57  Final Schedule 2.7(b). .......................................................................... 8
Section 1.58  Fully Diluted Shares. ............................................................................ 8
Section 1.59  GAAP. ................................................................................................... 9
Section 1.60  General Indemnification Escrow. ......................................................... 9

- ii -

Section 1.61    General Indemnification Escrow Termination Date. ............................. 9

Section 1.62    Governmental Authority. ........................................................ 9

Section 1.63    HSR Act. ................................................................................ 9

Section 1.64    Indebtedness. ......................................................................... 9

Section 1.65    Indemnified Company Option Matter. ................................... 10

Section 1.66    Indemnified CP Litigation Matter. ......................................... 10

Section 1.67    Indemnified Litigation Matters. ............................................. 10

Section 1.68    Indemnified Privacy Litigation Matter. ................................. 10

Section 1.69    Indemnity Claim. ................................................................. 10

Section 1.70    Intellectual Property. ........................................................... 10

Section 1.71    IRS. ...................................................................................... 10

Section 1.72    In-the-Money Option. .......................................................... 11

Section 1.73    In-the-Money Warrant. ......................................................... 11

Section 1.74    Investment Securities. .......................................................... 11

Section 1.75    Joint Filing. .......................................................................... 11

Section 1.76    Key Employee Agreements. .................................................. 11

Section 1.77    Knowledge of Company. ...................................................... 11

Section 1.78    Knowledge of Parent. ........................................................... 11

Section 1.79    Law. ...................................................................................... 11

Section 1.80    Lien. ..................................................................................... 11

Section 1.81    Limited's Ordinary Shares. ................................................... 12

Section 1.82    Losses. .................................................................................. 12

Section 1.83    Material Adverse Effect. ....................................................... 12

Section 1.84    Material Contract. ................................................................ 12

Section 1.85    May 31 Unaudited Financial Statements. ............................. 13

Section 1.86    Merger. ................................................................................. 13

Section 1.87    Merger Consideration. .......................................................... 13

Section 1.88    Merger Consideration Per Share. .......................................... 13

Section 1.89    Merger Subsidiary. ............................................................... 13

Section 1.90    Merger Subsidiary Common Stock. ...................................... 13

Section 1.91    Out -of-the-Money Options. .................................................. 13

Section 1.92    Out-of-the-Money Warrants. ................................................. 13

- iii -

Section 1.93    Parent. ........................................................................................ 13

Section 1.94    Parent Claim.................................................................................. 14

Section 1.95    Parent Indemnified Parties............................................................ 14

Section 1.96    Parent's Deferred Payment Obligations......................................... 14

Section 1.97    Per Option Closing Merger Consideration. ................................... 14

Section 1.98    Per Option Merger Consideration.................................................. 14

Section 1.99    Per Share Common Stock Closing Merger Consideration: Per
                Share Series A Stock Closing Merger Consideration: Per Share
                Series C Stock Closing Merger Consideration. ............................. 14

Section 1.100   Per Share Series A Preferred Stock Merger Consideration. .............. 14

Section 1.101   Per Share Series B Preferred Stock Merger Consideration. .............. 15

Section 1.102   Per Share Series C Preferred Stock Merger Consideration. .............. 15

Section 1.103   Per Warrant Closing Merger Consideration. ................................... 15

Section 1.104   Permits. ......................................................................................... 15

Section 1.105   Permitted Liens. ............................................................................ 15

Section 1.106   Person.:.......................................................................................... 15

Section 1.107   Plan of Merger. ............................................................................. 15

Section 1.108   Preliminary Acquisition Amount.................................................... 15

Section 1.109   Privacy Litigation Assumption Date............................................... 15

Section 1.110   Privacy Litigation Indemnification Escrow. ................................... 16

Section 1.111   Privacy Litigation Indemnification Escrow Termination Date.......... 16

Section 1.112   PTO................................................................................................ 16

Section 1.113   Real Property Lease. ...................................................................... 16

Section 1.114   Registered Intellectual Property...................................................... 16

Section 1.115   SDS Common Stock. ..................................................................... 16

Section 1.116   Series B Liquidation Preference Amount. ...................................... 16

Section 1.117   Shareholder Notice......................................................................... 16

Section 1.118   Shareholders' Representative.......................................................... 16

Section 1.119   Subsidiary. ..................................................................................... 17

Section 1.120   Surviving Corporation. ................................................................... 17

Section 1.121   Tax: Taxes...................................................................................... 17

Section 1.122   Tax Return. .................................................................................... 17

- iv -

Section 1.123    Tax Sharing Agreement. .................................................................. 17

Section 1.124    Third Party Indemnity Claim. ....................................................... 17

Section 1.125    Threshold Amount. ........................................................................ 17

Section 1.126    Trademarks. ................................................................................... 18

Section 1.127    Transaction Expenses. .................................................................. 18

Section 1.128    UPS Capital Lease. ....................................................................... 18

**ARTICLE II**    THE MERGER .................................................................................. 18

Section 2.1    The Merger. ..................................................................................... 18

Section 2.2    Effective Time. .............................................................................. 19

Section 2.3    Time and Place of Closing. ........................................................... 19

Section 2.4    Articles of Incorporation and Bylaws. ......................................... 19

Section 2.5    Board of Directors. ........................................................................ 19

Section 2.6    Management. .................................................................................. 19

Section 2.7    Closing Date Acquisition Amount. ............................................... 20

Section 2.8    Effect on Capital Stock. ................................................................ 21

Section 2.9    Transactions at Closing: Exchange of Certificates: Exchange Agent. .............................................................................................. 22

Section 2.10    Escrow. .......................................................................................... 24

**ARTICLE III**    REPRESENTATIONS AND WARRANTIES OF THE COMPANY .......... 26

Section 3.1    Organization and Authority of Company. ..................................... 26

Section 3.2    Capitalization. ............................................................................... 27

Section 3.3    Authority Relative to this Agreement. .......................................... 28

Section 3.4    Consents and Approvals: No Violations. ...................................... 29

Section 3.5    Title to Assets: Encumbrances. .................................................... 29

Section 3.6    Absence of Certain Events. .......................................................... 30

Section 3.7    Subsidiaries. .................................................................................. 32

Section 3.8    Financial Statements: Available Cash at Closing. ....................... 33

Section 3.9    Litigation. ...................................................................................... 34

Section 3.10    Employee Benefit Plans. ............................................................... 34

Section 3.11    Labor Matters. ............................................................................... 36

Section 3.12    Tax Matters. .................................................................................. 36

Section 3.13    Compliance with Law. .................................................................. 38

- v -

| Section 3.14 | Employees. | 38 |
|---|---|---|
| Section 3.15 | Transactions With Affiliates. | 39 |
| Section 3.16 | Fees and Expenses of Brokers and Others. | 39 |
| Section 3.17 | Intellectual Property. | 40 |
| Section 3.18 | Insurance. | 43 |
| Section 3.19 | Material Contracts. | 43 |
| Section 3.20 | Real Property. | 44 |
| Section 3.21 | No Undisclosed Liabilities. | 44 |
| Section 3.22 | Restrictions on Business Activities. | 44 |
| Section 3.23 | Corporate Names. | 45 |
| Section 3.24 | Bank Accounts. | 45 |
| Section 3.25 | Certain Practices. | 45 |
| **ARTICLE IV** | **REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUBSIDIARY** | 46 |
| Section 4.1 | Organization and Authority of the Parent. | 46 |
| Section 4.2 | Authority Relative to this Agreement. | 46 |
| Section 4.3 | Consents and Approvals; No Violations. | 46 |
| Section 4.4 | Litigation. | 47 |
| Section 4.5 | Fees and Expenses of Brokers and Others. | 47 |
| Section 4.6 | Due Diligence. | 47 |
| Section 4.7 | Availability of Funds. | 48 |
| Section 4.8 | No Additional Representations. | 48 |
| Section 4.9 | Disclaimer Regarding Estimates and Projections. | 48 |
| **ARTICLE V** | **COVENANTS RELATING TO CONDUCT OF BUSINESS** | 49 |
| Section 5.1 | Operation in the Ordinary Course. | 49 |
| Section 5.2 | Affirmative and Negative Covenants. | 49 |
| **ARTICLE VI** | **ADDITIONAL AGREEMENTS** | 51 |
| Section 6.1 | Access to Information and Employees. | 51 |
| Section 6.2 | Notice to the Company Shareholders of the Merger. | 52 |
| Section 6.3 | Reasonable Best Efforts; Notification; Hart-Scott-Rodino Act and Exon-Florio Filings. | 52 |
| Section 6.4 | Fees and Expenses. | 53 |

- vi -

Section 6.5      Public Announcements. .............................................................. 53

Section 6.6      Maintenance of D&O Insurance. ............................................. 54

Section 6.7      Solvency. ................................................................................. 54

Section 6.8      Company Warrants; Company Options; Certain Other Rights........... 54

Section 6.9      Employee Benefits Matters. ..................................................... 55

Section 6.10    Certain Tax Matters. ............................................................... 56

Section 6.11    Defense of Indemnified Litigation Matters. .......................... 57

Section 6.12    Acquisition Proposals. ............................................................ 60

**ARTICLE VII**   CONDITIONS PRECEDENT TO CONSUMMATION OF THE MERGER. ................................................................................. 61

Section 7.1      Conditions Precedent to Obligations of Each Party. ............ 61

Section 7.2      Conditions Precedent to Obligations of Parent and Merger Subsidiary. ............................................................................. 62

Section 7.3      Conditions Precedent to Obligations of Company. ............... 63

**ARTICLE VIII**  SURVIVAL; INDEMNIFICATION ............................................. 64

Section 8.1      Limitation on, and Survival of Representations and Warranties. ...... 64

Section 8.2      Indemnification by Company. ................................................ 65

Section 8.3      Indemnification by Buyer. ...................................................... 66

Section 8.4      Limitation of Liability. ........................................................... 66

Section 8.5      Notice of Indemnity Claims. .................................................. 67

Section 8.6      Shareholders' Representative. ................................................. 68

Section 8.7      Arbitration. ............................................................................. 69

Section 8.8      Indemnity Amounts to be Computed on After-Tax Basis. ............... 70

**ARTICLE IX**    TERMINATION; AMENDMENT; WAIVER. ............................... 70

Section 9.1      Termination. ........................................................................... 70

Section 9.2      Effect of Termination. ............................................................ 71

Section 9.3      Termination Fee Payable to Parent; Expense Reimbursement .......... 71

Section 9.4      Amendment. ........................................................................... 64

Section 9.5      Extension; Waiver. ................................................................. 64

**ARTICLE X**     MISCELLANEOUS ................................................................... 64

Section 10.1    Entire Agreement; Assignment. ............................................. 64

Section 10.2    Notices. .................................................................................. 65

- vii -

Section 10.3    Governing Law. ........................................................... 66

Section 10.4    Descriptive Headings. ................................................... 66

Section 10.5    Parties in Interest. ....................................................... 67

Section 10.6    Execution of this Agreement. .......................................... 67

Section 10.7    Severability. ............................................................... 67

- viii -

# EXHIBITS AND SCHEDULES

## EXHIBITS

| Exhibit 1.51 | Escrow Agreement |
| Exhibit 2.1(a) | Articles of Merger and Plan of Merger |

## SCHEDULES

| Schedule 1.28 | Company Shareholders |
| Schedule 1.76 | Key Employee Agreements |
| Schedule 1.77 | Knowledge of Company |
| Schedule 1.78 | Knowledge of Parent |
| Schedule 2.7(b) | Payment of Closing Date Acquisition Amount |
| Schedule 3.2 (a)(ii) | Outstanding Company Option |
| Schedule 3.2 (a)(iii) | Outstanding Company Warrant |
| Schedule 3.2(d) | Outstanding Rights to Purchase or Acquire Stock |
| Schedule 3.4 | Consents |
| Schedule 3.5 | Title to and Sufficiency of Assets: Encumbrances |
| Schedule 3.6 | Absence of Certain Events |
| Schedule 3.7 | Subsidiaries |
| Schedule 3.8 | Company Financial Statements |
| Schedule 3.9 | Litigation |
| Schedule 3.10 | Employee Benefit Plan Exceptions |
| Schedule 3.11 | Labor Matters |
| Schedule 3.12 | Tax Matters |
| Schedule 3.15 | Transactions with Affiliates |
| Schedule 3.17(b) | Company Registered Intellectual Property |
| Schedule 3.17(c) | Exceptions to Company Intellectual Property |
| Schedule 3.17(d) | Developed Intellectual Property |
| Schedule 3.17(e) | Transferred or Licensed Company Intellectual Property |
| Schedule 3.17(f) | Intellectual Property "License-In" Agreements |
| Schedule 3.17(g) | Intellectual Property Disputes |
| Schedule 3.17(h) | Exceptions to Valid Registration and Ownership of Company Intellectual Property |
| Schedule 3.17(i) | Material Disputes of Intellectual Property |
| Schedule 3.17(o) | Conflicts with Company Intellectual Property |
| Schedule 3.18 | Insurance |
| Schedule 3.19(a) | Material Contracts |
| Schedule 3.19(b) | Exceptions to Contracts |
| Schedule 3.20 | Real Property |
| Schedule 3.21 | Undisclosed Liabilities |
| Schedule 3.22 | Restrictions on Business Activities |
| Schedule 3.23 | Corporate Names |
| Schedule 3.24 | Bank Accounts |

Schedule 4.3        Consents
Schedule 7.2(c)    Resigning Persons
Schedule 7.2(f)    Required Third Party Consents

- x -

# AGREEMENT OF MERGER

THIS AGREEMENT OF MERGER (this "Agreement"). dated as of July 13. 2004. by and among REED ELSEVIER INC.. a Massachusetts corporation ("Parent"). LNS ACQUISITION CORP.. a Florida corporation and a direct. wholly-owned subsidiary of Parent ("Merger Subsidiary"). SEISINT. INC.. a Florida corporation ("Company"). and Morris C. Brown: in his capacity as the initial Shareholders' Representative for the limited purposes described herein. recites and provides as follows:

## RECITALS

WHEREAS. the respective Boards of Directors of Parent. Merger Subsidiary and Company have approved the merger of Merger Subsidiary with and into the Company (the "Merger"). upon the terms and subject to the conditions of this Agreement:

WHEREAS. pursuant to the Merger. each issued and outstanding share of the Company's Common Stock. par value $.001 per share (the "Company Common Stock"). will be converted into the right to receive the Per Share Common Stock Closing Merger Consideration (as hereinafter defined). plus such share's allocable portion of the Parent's Deferred Payment Obligations (the "Per Share Common Stock Merger Consideration"):

WHEREAS. pursuant to the Merger. (i) each issued and outstanding share of the Company's Series A Preferred Stock. par value $.001 per share (the "Company Series A Preferred Stock") will be converted into the right to receive the Per Share Series A Stock Closing Merger Consideration (as hereinafter defined) plus such share's allocable portion of the Parent's Deferred Payment Obligations (the "Per Share Series A Preferred Stock Merger Consideration"): (ii) each issued and outstanding share of the Company's Series B Preferred. Stock. par value $.001 per share (the "Company Series B Preferred Stock"). will be converted into the right to receive $31.50. which amount constitutes the liquidation preference payable to the holders of the Company Series B Preferred Stock in connection with the Merger (the "Per Share Series B Preferred Stock Merger Consideration"): and (iii) each issued and outstanding share of the Company's Series C Preferred Stock. par value $.001 per share (the "Company Series C Preferred Stock"). will be converted into the right to receive the Per Share Series C Stock Closing Merger Consideration (as hereinafter defined) plus such share's allocable portion of the Parent's Deferred Payment Obligations (the "Per Share Series C Preferred Stock Merger Consideration"):

WHEREAS. pursuant to the Merger. (i) each outstanding option to purchase Company Common Stock (a "Company Option") with an exercise price per share of less than the Merger Consideration Per Share (each. an "In-the-Money Option") shall be converted into the right to receive an amount equal to the Per Option Closing Merger Consideration (as hereinafter defined) plus such option's allocable portion of the Parent's Deferred Payment Obligations (the "Per Option Merger Consideration"). and (ii) each outstanding warrant to purchase Company Common Stock (a "Company Warrant") with an exercise price per share of less than the Merger Consideration Per Share (each. an "In-the-Money Warrant") shall be converted into the right to receive an amount equal to the Per Warrant Closing Merger Consideration (as hereinafter

defined) plus such warrant's allocable portion of the Parent's Deferred Payment Obligations (the "Per Warrant Merger Consideration"). all as provided and subject to the terms and conditions set forth herein:

WHEREAS, Parent and each of Henry E. Asher. Paul Cameron. David Bayliss and Richard Chapman have entered into mutually satisfactory non-competition agreements which become effective upon consummation of the Merger:

WHEREAS, Merger Subsidiary and Paul Cameron have entered into a mutually satisfactory employment agreement which becomes effective upon consummation of the Merger:

WHEREAS, the Company and the holder of the Company Series C Preferred Stock have entered into a Stock Conversion Agreement pursuant to which such holder has agreed to convert his shares of Company Series C Preferred Stock into an equal number of shares of Company Common Stock effective immediately prior to. but conditioned upon. the consummation of the Merger;

WHEREAS, Parent and each of Henry E. Asher. Paul Cameron and Kenneth Schwartz have entered into mutually satisfactory Litigation Support and Cooperation Agreements which become effective upon consummation of the Merger:

WHEREAS, Company. Merger Subsidiary and Parent desire to make certain representations. warranties. covenants and agreements in connection with the Merger and also to prescribe various conditions to the Merger: and

NOW, THEREFORE, in consideration of the premises. which are incorporated into and made part of this Agreement. and of the mutual representations. warranties. covenants. agreements and conditions set forth herein and for other good and valuable consideration. the receipt and sufficiency of which are hereby acknowledged. the parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Acquired Companies.

"Acquired Companies" shall mean. collectively. the Company and the Acquired Subsidiaries.

Section 1.2    Acquired Subsidiaries.

"Acquired Subsidiaries" shall mean. collectively. Seisint Decision Services. Inc.. a Florida corporation ("SDS"). and Seisint. Ltd.. a limited liability company organized under the laws of England and Wales ("Limited").

- 2 -

Section 1.3    Acquisition Transaction.

"Acquisition Transaction" shall have the meaning set forth in Section 6.12(a) hereof.

Section 1.4    Aggregate Acquisition Amount.

"Aggregate Acquisition Amount" shall mean the sum of (i) the Closing Date Acquisition Amount plus (ii) Parent's Deferred Payment Obligations.

Section 1.5    Aggregate Company Option Exercise Proceeds.

"Aggregate Company Option Exercise Proceeds" shall be equal to the aggregate proceeds which would be payable by the holders of all In-the-Money Options if all such In-the-Money Options were exercised in full immediately prior to the Effective Time.

Section 1.6    Aggregate Company Warrant Exercise Proceeds.

"Aggregate Company Warrant Exercise Proceeds" shall be equal to the aggregate proceeds which would be payable by the holders of all In-the-Money Warrants if all such In-the-Money Warrants were exercised in full immediately prior to the Effective Time.

Section 1.7    Agreement.

"Agreement" shall have the meaning set forth in the preamble to this Agreement.

Section 1.8    Articles of Merger.

"Articles of Merger" shall have the meaning set forth in Section 2.1(a) hereof.

Section 1.9    Available Cash at Closing.

"Available Cash at Closing" shall have the meaning set forth in Section 3.8(b) hereof.

Section 1.10    Cash Balance Plan.

"Cash Balance Plan" shall have the meaning set forth in Section 6.9(b) hereof.

Section 1.11    Certificates

"Certificates" shall have the meaning set forth in Section 2.9(b) hereof.

Section 1.12    CFIUS.

"CFIUS" shall have the meaning set forth in Section 6.3(c) hereof.

- 3 -

Section 1.13    Closing

"Closing" shall have the meaning set forth in Section 2.3 hereof.

Section 1.14 ·  Closing Date

"Closing Date" shall mean the date on which the Closing occurs.

Section 1.15    Closing Date Acquisition Amount

"Closing Date Acquisition Amount" shall have the meaning set forth in Section 2.7(a) hereof.

Section 1.16    Code

"Code" shall mean the Internal Revenue Code of 1986, as amended.

Section 1.17    Company.

"Company" shall have the meaning set forth in the preamble to this Agreement.

Section 1.18    Company Affiliate.

"Company Affiliate" shall have the meaning set forth in Section 3.15 hereof

Section 1.19    Company Claim.

"Company Claim" shall have the meaning set forth in Section 8.3 hereof.

Section 1.20    Company Common Stock.

"Company Common Stock" shall have the meaning set forth in the recitals to this Agreement.

Section 1.21    Company Dissenting Holder.

"Company Dissenting Holder" shall have the meaning set forth in Section 2.8(c) hereof.

Section 1.22    Company Employees.

"Company Employees" shall have the meaning set forth in Section 3.10(a) hereof.

- 4 -

Section 1.23    Company ESOP.

"Company ESOP" shall mean the Company's 1999 Restated Stock Option Plan effective January 18. 1999.

Section 1.24    Company Financial Statements.

"Company Financial Statements" shall have the meaning set forth in Section 3.8(a) hereof.

Section 1.25    Company Indemnified Parties.

"Company Indemnified Parties" shall have the meaning set forth in Section 8.3 hereof.

Section 1.26    Company Intellectual Property.

"Company Intellectual Property" shall have the meaning set forth in Section 3.17(a)(ii) hereof.

Section 1.27    Company Option.

"Company Option" shall have the meaning set forth in the recitals to this Agreement.

Section 1.28    Company Preferred Stock.

"Company Preferred Stock" shall mean. collectively. Company Series A Preferred Stock. Company Series B Preferred Stock and Company Series C Preferred Stock.

Section 1.29    Company Registered Intellectual Property.

"Company Registered Intellectual Property" shall have the meaning set forth in Section 3.17(b) hereof.

Section 1.30    Company Series A Preferred Stock.

"Company Series A Preferred Stock" shall have the meaning set forth in the recitals to this Agreement.

Section 1.31    Company Series B Preferred Stock.

"Company Series B Preferred Stock" shall have the meaning set forth in the recitals to this Agreement.

- 5 -

Section 1.32   Company Series C Preferred Stock.

"Company Series C Preferred Stock" shall have the meaning set forth in the recitals to this Agreement.

Section 1.33   Company Shareholders.

"Company Shareholders" shall mean the Persons listed on Schedule 1.33, which shall include all holders of all the Company Common Stock. Company Preferred Stock. Company Options and Company Warrants as of immediately prior to the Effective Time.

Section 1.34   Company Warrant.

"Company Warrant" shall have the meaning set forth in the recitals to this Agreement.

Section 1.35   Confidentiality Agreement.

"Confidentiality Agreement" shall have the meaning set forth in Section 6.1(a) hereof.

Section 1.36   Consultants.

"Consultants" shall have the meaning set forth in Section 3.14(c) hereof.

Section 1.37   Contracts.

"Contracts" shall mean all contracts. agreements. leases. licenses. arrangements. understandings. relationships and commitments. whether written or oral (and all amendments. side letters. modifications and supplements thereto).

Section 1.38   CP Litigation Assumption Date.

"CP Litigation Assumption Date" shall have the meaning set forth in Section 6.11(a) hereof.

Section 1.39   CP Litigation Indemnification Escrow.

"CP Litigation Indemnification Escrow" shall have the meaning set forth in Section 2.10(a) hereof.

- 6 -

Section 1.40   CP Litigation Indemnification Escrow Termination Date.

"CP Litigation Indemnification Escrow Termination Date" shall have the meaning set forth in Section 2.10(c) hereof.

Section 1.41   December 31 Audited Financial Statements.

"December 31 Audited Financial Statements" shall have the meaning set forth in Section 3.8(a).

Section 1.42   Dissenting Shares.

"Dissenting Shares" shall have the meaning set forth in Section 2.8(c) hereof.

Section 1.43   Distributable Percentage.

"Distributable Percentage" shall mean with respect to each Escrow Shareholder, an amount equal to (i) the total number of Fully Diluted Shares held by such Escrow Shareholder immediately prior to the Effective Time, divided by (ii) the number of Fully Diluted Shares.

Section 1.44   D&O Insurance.

"D&O Insurance" shall have the meaning set forth in Section 6.6 hereof.

Section 1.45   DOJ.

"DOJ" shall have the meaning set forth in Section 6.3(b) hereof.

Section 1.46   Domain Names.

"Domain Names" shall have the meaning set forth in Section 3.17(a) hereof.

Section 1.47   Effective Time.

"Effective Time" shall have the meaning set forth in Section 2.2 hereof.

Section 1.48   Employee Benefit Plan.

"Employee Benefit Plan" shall have the meaning set forth in Section 3.10 hereof.

Section 1.49   ERISA.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

- 7 -

Section 1.50  Escrow Agent.

"Escrow Agent" shall have the meaning set forth in Section 2.10(a) hereof.

Section 1.51  Escrow Agreement.

"Escrow Agreement" shall mean the escrow agreement, dated as of the Closing Date, among Parent, the Shareholders' Representative and the Escrow Agent, substantially in the form of Exhibit 1.51 attached hereto.

Section 1.52  Escrow Fund.

"Escrow Fund" shall have the meaning set forth in Section 2.10(a) hereof.

Section 1.53  Escrow Shareholders.

"Escrow Shareholders" shall mean the holders of the Company Common Stock, Company Series A Preferred Stock, Company Series C Preferred Stock, In-the-Money Options and In-the-Money Warrants as of immediately prior to the Effective Time.

Section 1.54  Exchange Agent.

"Exchange Agent" shall have the meaning set forth in Section 2.9(b) hereof.

Section 1.55  Exon-Florio Amendment.

"Exon-Florio Amendment" shall mean Section 721 of Title VII of the Defense Production Act of 1980, as amended by Section 5021 of the Omnibus Trade and Competitiveness Act of 1988.

Section 1.56  FBCA.

"FBCA" shall mean the Florida Business Corporation Act, as amended.

Section 1.57  Final Schedule 2.7(b).

"Final Schedule 2.7(b)" shall have the meaning set forth in Section 2.7(b).

Section 1.58  Fully Diluted Shares.

"Fully Diluted Shares" shall mean a number of shares equal to the sum (a) the total number of shares of Company Common Stock outstanding immediately prior to the Effective Time, plus (b) the total number of shares of Company Series A Preferred Stock outstanding immediately prior to the Effective Time, plus (c) the total number of shares of Company Series C

- 8 -

Preferred Stock outstanding immediately prior to the Effective Time, plus (d) the total number of shares of Company Common Stock that could be obtained through the exercise of all In-the-Money Options outstanding immediately prior to the Effective Time (without any withholding of shares to pay the exercise price or Taxes) and as provided in Section 2.8(a)(v) hereof, plus (e) the total number of shares of Company Common Stock that could be obtained through the exercise of all In-the-Money Warrants outstanding immediately prior to the Effective Time (without any withholding of shares to pay the exercise price or Taxes) and as provided in Section 2.8(a)(vi) hereof.

Section 1.59   GAAP.

"GAAP" shall mean generally accepted accounting principles as in effect in the United States of America at the time of the preparation of the subject financial statement.

Section 1.60   General Indemnification Escrow.

"General Indemnification Escrow" shall have the meaning set forth in Section 2.10(a).

Section 1.61   General Indemnification Escrow Termination Date.

"General Indemnification Escrow Termination Date" shall have the meaning set forth in Section 2.10(b).

Section 1.62   Governmental Authority.

"Governmental Authority" shall mean any federal, state, national, provincial, municipal or other governmental department, commission, board, bureau, agency, administrative body, instrumentality or arbitration panel, or any court or tribunal, in each case whether of the United States, any of its possessions or territories, or of any foreign nation.

Section 1.63   HSR Act.

"HSR Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

Section 1.64   Indebtedness.

"Indebtedness" means all obligations, contingent and otherwise, which in accordance with GAAP, applied on a basis consistent with prior periods, should be classified on the obligor's balance sheet as liabilities, or to which reference should be made by footnote thereto, including, without limitation, in any event and whether or not so classified: (a) all debt and similar monetary obligations, whether direct or indirect; (b) all liabilities secured by any mortgage, pledge, security interest, lien, charge or other encumbrance existing on property

- 9 -

owned or acquired and subject thereto. whether or not the liability secured thereby shall have been assumed: (c) all guaranties. endorsements and other contingent obligations. whether direct or indirect in respect of Indebtedness or performance of others. including any obligation to supply funds to or in any manner to invest in. directly or indirectly. the debtor. to purchase Indebtedness. or to assure the owner of Indebtedness against loss. through an agreement to purchase goods. supplies or services for the purpose of enabling the debtor to make payment of the Indebtedness held by such owner or otherwise: (d) the deferred portion or installments of purchase price. and any amounts reserved for the payment of a contingent purchase price. in connection with the acquisition of any business: and (e) obligations to reimburse issuers of any letters of credit.

Section 1.65    Indemnified Company Option Matter.

"Indemnified Company Option Matter" shall have the meaning set forth in Section 8.2(c) hereof.

Section 1.66    Indemnified CP Litigation Matter.

"Indemnified CP Litigation Matter" shall have the meaning set forth in Section 8.2(b)(i) hereof.

Section 1.67    Indemnified Litigation Matters.

"Indemnified Litigation Matters" shall have the meaning set forth in Section 6.11 hereof.

Section 1.68    Indemnified Privacy Litigation Matter.

"Indemnified Privacy Litigation Matter" shall have the meaning set forth in Section 8.2(b)(ii) hereof.

Section 1.69    Indemnity Claim.

"Indemnity Claim" shall have the meaning set forth in Section 8.5 hereof.

Section 1.70    Intellectual Property

"Intellectual Property" shall have the meaning set forth in Section 3.17(a)(i) hereof.

Section 1.71    IRS.

"IRS" shall mean the Internal Revenue Service.

- 10 -

Section 1.72   In-the-Money Option.

"In-the-Money Option" shall have the meaning set forth in the recitals to this Agreement.

Section 1.73   In-the-Money Warrant.

"In-the-Money Warrant" shall have the meaning set forth in the recitals to this Agreement.

Section 1.74   Investment Securities.

"Investment Securities" shall mean (i) 276.923 shares of the common stock of BankAtlantic Bancorp. Inc. and (ii) 187.091 shares of the common stock of Levitt Corporation.

Section 1.75   Joint Filing.

"Joint Filing" shall have the meaning set forth in Section 6.3(c) hereof.

Section 1.76   Key Employee Agreements.

"Key Employee Agreements" shall mean the existing employment contracts and non-compete agreements of the Company and the Acquired Subsidiaries with the employees set forth on Schedule 1.76.

Section 1.77   Knowledge of Company.

"Knowledge of Company" shall mean the actual knowledge of the persons set forth on Schedule 1.77.

Section 1.78   Knowledge of Parent.

"Knowledge of Parent" shall mean the actual knowledge of the persons set forth on Schedule 1.78.

Section 1.79   Law.

"Law" shall mean any federal. state. national. provincial. local or other law. statute. act. ordinance or other governmental requirement of any kind. and the rules. regulations and orders promulgated thereunder.

Section 1.80   Lien.

"Lien" shall mean any mortgages. liens. pledges. charges.. security interests or encumbrances of any kind.

- 11 -

Section 1.81    Limited's Ordinary Shares.

"Limited's Ordinary Shares" shall have the meaning set forth in Section 3.2(c) hereof.

Section 1.82    Losses.

"Losses" shall have the meaning set forth in Section 8.2(a) hereof.

Section 1.83    Material Adverse Effect.

"Material Adverse Effect" shall mean. with respect to any entity or group of entities. a material adverse effect on the assets. business. financial condition or results of operations of such entity or group of entities taken as a whole. other than any event. change. circumstance or effect relating (i) to the United States economy in general or the economy of any foreign country in general in which the Company or any of the Acquired Subsidiaries operates (provided that such do not affect the operations or financial condition of the Company or any of the Acquired Subsidiaries in a materially disproportionate manner). (ii) in general to the industries in which the Company or any of the Acquired Subsidiaries operate (provided that such do not affect the operations or financial condition of the Company or any of the Acquired Subsidiaries in a materially disproportionate manner). (iii) to the announcement of the Agreement or any of the transactions contemplated hereunder. the fulfillment of the parties' obligations hereunder or the consummation of the transactions contemplated by this Agreement. or (iv) to any outbreak or escalation of hostilities or act of terrorism involving the United States or any declaration of war by the United States.

Section 1.84    Material Contract.

"Material Contract" means (i) any outstanding Contract or other agreement (whether in writing or not) (whether or not entered into in the ordinary course of business unless otherwise noted below) entered into by or otherwise binding upon Company or any Subsidiary and obligating. committing or entitling (as applicable) the Company or any Subsidiary to (A) expend or otherwise pay an amount in excess of $500.000 in any year. or $2.500.000 in the aggregate. during the three (3) year period after the date hereof. (B) receive an amount in excess of $500.000 in any year. or $2.500.000 in the aggregate. during the three (3) year period after the date hereof (including aggregate receipts pursuant to multi-year software contracts). or (C) incur any Indebtedness (direct or indirect. thus. including. without limitation. any guaranty. endorsement or other contingent obligation) in an amount in excess of $500.000 in any year. or $2.500.000 in the aggregate. during the three (3) year period after the date hereof and (ii) any data supply contract which by its terms obligates the Company or any Subsidiary to expend or otherwise pay an amount in excess of $100.000 in any year. or $500.000 in the aggregate. during the three (3) year period after the date hereof (or. although not so obligated by its terms. the Company nonetheless expended or otherwise paid an amount in excess of $100.000 during the eighteen-month period commencing January 1. 2003 and ending on June 30. 2004.

- 12 -

Section 1.85    May 31 Unaudited Financial Statements.

"May 31 Unaudited Financial Statements" shall have the meaning set forth in Section 3.8(a) hereof.

Section 1.86    Merger.

"Merger" shall have the meaning set forth in the recitals to this Agreement.

Section 1.87    Merger Consideration.

"Merger Consideration" shall mean, with respect to each Company Shareholder, that portion of the Aggregate Acquisition Amount payable to such Company Shareholder in accordance with the terms of this Agreement.

Section 1.88    Merger Consideration Per Share.

"Merger Consideration Per Share" shall mean the dollar amount equal to (a) the Aggregate Acquisition Amount minus the Series B Liquidation Preference Amount, divided by (b) the Fully Diluted Shares.

Section 1.89    Merger Subsidiary.

"Merger Subsidiary" shall have the meaning set forth in the preamble to this Agreement.

Section 1.90    Merger Subsidiary Common Stock.

"Merger Subsidiary Common Stock" shall mean the Common Stock, $0.01 par value per share, of Merger Subsidiary.

Section 1.91    Out-of-the-Money Options.

"Out-of-the-Money Options" shall mean all outstanding Company Options with a per share exercise price equal to or greater than the Merger Consideration Per Share.

Section 1.92    Out-of-the-Money Warrants.

"Out-of-the-Money Warrants" shall mean all outstanding Company Warrants with a per share exercise price equal to or greater than the Merger Consideration Per Share.

Section 1.93    Parent.

"Parent" shall have the meaning set forth in the preamble to this Agreement.

- 13 -

Section 1.94    Parent Claim.

"Parent Claim" shall have the meaning set forth in Section 8.2(a) hereof.

Section 1.95    Parent Indemnified Parties.

"Parent Indemnified Parties" shall have the meaning set forth in Section 8.2 hereof.

Section 1.96    Parent's Deferred Payment Obligations.

"Parent's Deferred Payment Obligations" shall mean Parent's obligations to pay to the Escrow Shareholders. subject to the terms of this Agreement and the Escrow Agreement. the balance of the Escrow Fund (net of the amount of any Losses payable. or paid by reason of a Parent Claim) which is payable to the Escrow Shareholders at the times provided in the Escrow Agreement and Section 2.10(a) hereof.

Section 1.97    Per Option Closing Merger Consideration.

"Per Option Closing Merger Consideration" shall mean. with respect to each In-the-Money Option. the amount by which (a) the Per Share Common Stock Closing Merger Consideration exceeds (b) the per share exercise price of such In-the-Money Option.

Section 1.98    Per Option Merger Consideration.

"Per Option Merger Consideration" shall have the meaning set forth in the recitals to this Agreement.

Section 1.99    Per Share Common Stock Closing Merger Consideration; Per Share Series A Stock Closing Merger Consideration; Per Share Series C Stock Closing Merger Consideration.

"Per Share Common Stock Closing Merger Consideration"; "Per Share Series A Stock Closing Merger Consideration" and "Per Share Series C Stock Closing Merger Consideration" shall each mean an amount equal to (a) (1) the Closing Date Acquisition Amount. plus (2) the Aggregate Company Option Exercise Proceeds. plus (3) the Aggregate Company Warrant Exercise Proceeds. less (4) the Series B Liquidation Preference Amount. divided by (b) the number of Fully Diluted Shares. in each case as set forth in the Final Schedule 2.7(b).

Section 1.100    Per Share Series A Preferred Stock Merger Consideration.

"Per Share Series A Preferred Stock Merger Consideration" shall have the meaning set forth in the recitals to this Agreement.

- 14 -

Section 1.101  Per Share Series B Preferred Stock Merger Consideration.

"Per Share Series B Preferred Stock Merger Consideration" shall have the meaning set forth in the recitals to this Agreement.

Section 1.102  Per Share Series C Preferred Stock Merger Consideration.

"Per Share Series C Preferred Stock Merger Consideration" shall have the meaning set forth in the recitals to this Agreement.

Section 1.103  Per Warrant Closing Merger Consideration.

"Per Warrant Closing Merger Consideration" shall mean, with respect to each In-the-Money Warrant, the amount by which (a) the Per Share Common Stock Closing Merger Consideration exceeds (b) the per share exercise price of such In-the-Money Warrant.

Section 1.104  Permits.

"Permits" shall mean all permits, licenses, variances, exemptions, orders, registrations and approvals and governmental authorizations of all Governmental Authorities.

Section 1.105  Permitted Liens.

"Permitted Liens" shall have the meaning set forth in Section 3.5(a) hereof.

Section 1.106  Person.

"Person" shall mean any individual, corporation, partnership, limited liability Company, association, trust, unincorporated entity or other legal entity.

Section 1.107  Plan of Merger.

"Plan of Merger" shall have the meaning set forth in Section 2.1(a) hereof.

Section 1.108  Preliminary Acquisition Amount.

"Preliminary Acquisition Amount" shall have the meaning set forth in Section 2.7(a)(i) hereof.

Section 1.109  Privacy Litigation Assumption Date.

"Privacy Litigation Assumption Date" shall have the meaning set forth in Section 6.11(a) hereof.

- 15 -

Section 1.110 Privacy Litigation Indemnification Escrow.

"Privacy Litigation Indemnification Escrow" shall have the meaning set forth in Section 2.10 hereof.

Section 1.111 Privacy Litigation Indemnification Escrow Termination Date.

"Privacy Litigation Indemnification Escrow Termination Date" shall have the meaning set forth in Section 2.10(a) hereof.

Section 1.112 PTO

"PTO" shall have the meaning set forth in Section 3.17(b) hereof.

Section 1.113 Real Property Lease.

"Real Property Lease" shall have the meaning set forth in Section 3.20 hereof.

Section 1.114 Registered Intellectual Property

"Registered Intellectual Property" shall have the meaning set forth in Section 3.17(a)(iii) hereof.

Section 1.115 SDS Common Stock.

"SDS Common Stock" shall have the meaning set forth in Section 3.2(b) hereof.

Section 1.116 Series B Liquidation Preference Amount.

"Series B Liquidation Preference Amount" shall mean an amount equal to (a) the Per Share Series B Preferred Stock Merger Consideration, times (b) the number of shares of Company Series B Preferred Stock outstanding immediately prior to the Effective Time.

Section 1.117 Shareholder Notice.

"Shareholder Notice" shall have the meaning set forth in Section 6.2 hereof.

Section 1.118 Shareholders' Representative.

"Shareholders' Representative" shall mean Morris C. Brown, c/o Greenberg Traurig P.A., 777 South Flagler Drive, Suite 300 East, West Palm Beach, Florida 33401, or any other Person selected as a successor thereto in accordance with the provisions of the Escrow Agreement.

- 16 -

Section 1.119 Subsidiary.

"Subsidiary" shall mean each Person with respect to which a party has the right to vote (directly or indirectly through one or more other Persons or otherwise) shares representing 50% or more of the votes eligible to be cast in the election of directors of such Person.

Section 1.120 Surviving Corporation.

"Surviving Corporation" shall have the meaning set forth in Section 2.1(a) hereof.

Section 1.121 Tax; Taxes.

"Tax" or "Taxes" shall mean (i) any and all federal, state, local and foreign taxes, assessments and other governmental charges, duties and impositions, including taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and goods and services, value added, *ad valorem*, transfer, franchise, withholding, payroll, recapture, employment, excise and property taxes, together with all interest, penalties and additions imposed with respect to such amounts, and (ii) any liability for the payment of any amounts of the type described in clause (i) as a result of being a member of an affiliated, consolidated, combined or unitary group for any period.

Section 1.122 Tax Return.

"Tax Return" means any report, return, information return, or other information required to be supplied to a taxing authority in connection with Taxes, including any return of an affiliated, combined or unitary group.

Section 1.123 Tax Sharing Agreement.

"Tax Sharing Agreement" shall mean any agreement or arrangement for the allocation or payment of Tax liabilities or payment for Tax benefits by reason of the Company and the Acquired Subsidiaries filing Tax Returns on a consolidated, combined or unitary basis with any Person other than an Acquired Company.

Section 1.124 Third Party Indemnity Claim.

"Third Party Indemnity Claim" shall have the meaning set forth in Section 8.5 hereof.

Section 1.125 Threshold Amount.

"Threshold Amount" shall have the meaning set forth in Section 8.4.

- 17 -

Section 1.126  Trademarks.

"Trademarks" shall have the meaning set forth in Section 3.17(a)(i) hereof.

Section 1.127  Transaction Expenses.

"Transaction Expenses" shall mean, to the extent not paid prior to the Effective Time, all costs, fees and expenses incurred by the Acquired Companies in connection with the negotiation, preparation and execution of this Agreement and the transactions contemplated hereby, including the fees and expenses of its legal and financial advisors, accountants, the Company's portion of any Taxes paid or payable in connection with the exercise of employee options, bonus payments made to employees of the Company in connection with the transactions contemplated by this Agreement and escrow/exchange agent fees incurred by the Acquired Companies in connection with the Closing of the Merger, and which, in the aggregate, will not exceed $8,500,000.

Section 1.128  UPS Capital Lease.

"UPS Capital Lease" shall mean that certain Master Management Equipment and Lease Agreement dated June 26, 2001, by and between UPS Capital Corporation and the Company.

## ARTICLE II

## THE MERGER

Section 2.1    The Merger.

(a)     Immediately prior to the Effective Time, Company shall execute and deliver articles of merger (the "Articles of Merger"), together with the related plan of merger meeting the requirements of Section 607.1101 of the FBCA (the "Plan of Merger"), substantially in the form attached hereto as Exhibit 2.1(a), which shall be filed with the Secretary of State of the State of Florida in accordance with the FBCA.  Subject to the terms and conditions of this Agreement, at the Effective Time, Merger Subsidiary shall be merged with and into Company in accordance with the provisions of, and with the effects provided in, Section 607.1106 of the FBCA.  Company shall be the surviving corporation (the "Surviving Corporation") resulting from the Merger and as a result shall become a wholly owned subsidiary of Parent, shall continue to be governed by the Laws of the State of Florida and shall succeed to and assume all of the rights and obligations of Merger Subsidiary, and the separate corporate existence of Merger Subsidiary shall cease.

(b)     If at any time after the Effective Time of the Merger, the Surviving Corporation shall consider or be advised that any further assignments or assurances in law or otherwise are necessary or desirable to vest, perfect or confirm, of record or otherwise, in the Surviving Corporation, all rights, title and interests in all real estate and other property and all privileges,

- 18 -

powers and franchises of Company and Merger Subsidiary, then the Surviving Corporation and its proper officers and directors, in the name and on behalf of Company and Merger Subsidiary, shall execute and deliver all such proper deeds, assignments and assurances in law and do all things necessary and proper to vest, perfect or confirm title to such property or rights in the Surviving Corporation and otherwise to carry out the purpose of this Agreement, and the proper officers and directors of the Surviving Corporation are fully authorized in the name of Company and Merger Subsidiary or otherwise to take any and all such action.

Section 2.2     Effective Time.

The Merger shall become effective upon (i) the Articles of Merger having been accepted for filing by the Secretary of State of the State of Florida or (ii) at such later time as is set forth in the Articles of Merger (the "Effective Time").

Section 2.3     Time and Place of Closing.

The closing of the transactions contemplated by this Agreement shall take place at a time and on a date mutually agreed upon by the parties hereto, provided that such date shall be no later than the third business day following the date on which all of the conditions to the obligations of the parties set forth in Article VII have been satisfied or waived as provided therein (the "Closing"). The Closing shall take place at the offices of Hunton & Williams LLP, 11 H Brickell Avenue, Suite 2500, Miami, Florida 33131.

Section 2.4     Articles of Incorporation and Bylaws.

(a)     The Articles of Incorporation of Company, as in effect immediately prior to the Effective Time of the Merger shall be the Articles of Incorporation of the Surviving Corporation until thereafter changed or amended as provided therein or by applicable Law.

(b)     The Bylaws of Company, as in effect immediately prior to the Effective Time of the Merger shall be the Bylaws of the Surviving Corporation until thereafter changed or amended as provided therein or by applicable Law.

Section 2.5     Board of Directors.

The Board of Directors of Merger Subsidiary immediately prior to the Effective Time shall be the Board of Directors of the Surviving Corporation at the Effective Time.

Section 2.6     Management.

The principal officers of Merger Subsidiary immediately prior to the Effective Time shall be the principal officers of the Surviving Corporation at the Effective Time.

- 19 -

Section 2.7    Closing Date Acquisition Amount.

(a)    The total cash consideration payable on the Closing Date by Parent to the Company Shareholders for the Company Common Stock, the Company Preferred Stock, the Company Options and the Company Warrants shall be an amount (the "Closing Date Acquisition Amount") equal to:

(i)    SEVEN HUNDRED SEVENTY FIVE MILLION DOLLARS ($775,000,000) (the "Preliminary Acquisition Amount"); minus

(ii)    the amount of the Escrow Fund deposited with the Escrow Agent in accordance with the provisions of Section 2.10 hereof.

(b)    Not later than two business days prior to the Closing, Company shall deliver to Parent a revised and final Schedule 2.7(b) (the "Final Schedule 2.7(b)", substantially in the form attached hereto, and such schedule shall set forth the name of each Company Shareholder and that portion of the Closing Date Acquisition Amount to be paid to such Company Shareholder at the Closing in accordance with Sections 2.8 and 2.9 hereof; provided that, the aggregate amount of the Merger Consideration to be paid to all Company Shareholders at the Closing shall not exceed the Closing Date Acquisition Amount. The Final Schedule 2.7(b) shall be accompanied by wire instructions or other payment instructions for each of the holders of the Company Common Stock and Company Preferred Stock listed on the Final Schedule 2.7(b) (if not previously provided by Company to Parent). The Closing Date Acquisition Amount shall be paid at Closing as follows:

(i)    to the Exchange Agent for disbursement on the Closing Date to the holders of the Company Common Stock and Company Preferred Stock in accordance with the terms of this Agreement, the amounts set forth opposite each such Company Shareholder's name on the Final Schedule 2.7(b) and determined in accordance with Section 2.8(a)(i)-(iv) hereof;

(ii)    to Company, for payment on the first business day after the Closing Date to the holders of In-the-Money Options, with respect to each share of Company Common Stock subject to the outstanding options held by such holders, the Per Option Closing Merger Consideration set forth on the Final Schedule 2.7(b) and determined in accordance with Section 2.8(a)(v) hereof; and

(iii)    to Company, for payment on the first business day after the Closing Date to the holders of In-the-Money Warrants, with respect to each share of Company Common Stock subject to the outstanding warrants held by such holders, the Per Warrant Closing Merger Consideration set forth on the Final Schedule 2.7(b) and determined in accordance with Section 2.8(a)(vi) hereof.

- 20 -

(c)     In addition. on the Closing Date. Parent shall pay to the Escrow Agent the amount of the Escrow Fund in accordance with Section 2.10 hereof.

Section 2.8     Effect on Capital Stock.

As of the Effective Time of the Merger. by virtue of the Merger and without any action on the part of any holders of Company Common Stock. Company Preferred Stock. Company Options. Company Warrants or capital stock of Merger Subsidiary:

(a)     Subject to the other provisions of this Section 2.8 and the escrow provisions in Section 2.10. (i) each issued and outstanding share of Company Common Stock shall be converted into the right to receive. upon the surrender of the certificate formerly representing such share of Company Common Stock in accordance with Section 2.9 hereof. the Per Share Common Stock Merger Consideration:  (ii) each issued and outstanding share of Company Series A Preferred Stock shall be converted into the right to receive. upon the surrender of the certificate formerly representing such share of Company Series A Preferred Stock in accordance with Section 2.9 hereof. the Per Share Series A Preferred Stock Merger Consideration: (iii) each issued and outstanding share of Company Series B Preferred Stock shall be converted into the right to receive. upon the surrender of the certificate formerly representing such share of Company Series B Preferred Stock in accordance with Section 2.9 hereof. $31.50. which amount constitutes the liquidation preference payable to the holders of the Company Series B Preferred Stock and is the Per Share Series B Preferred Stock Merger Consideration: (iv) each issued and outstanding share of Company Series C Preferred Stock shall be converted into the right to receive. upon the surrender of the certificate formerly representing such share of Company Series C Preferred Stock in accordance with Section 2.9 hereof. the Per Share Series C Preferred Stock Merger Consideration: (v) each In-the-Money Option shall be converted into the right to receive an amount equal to the Per Option Merger Consideration. (vi) each In-the-Money Warrant shall be converted into the right to receive an amount equal to the Per Warrant Merger Consideration. and (vii) each Out-of-the-Money Option and Out-of-the Money Warrant shall be cancelled without consideration and shall have no further force or effect.

(b)     Each share of Merger Subsidiary Common Stock issued and outstanding immediately prior to the Effective Time of the Merger will be converted into one share of the common stock. par value $0.01 per share. of the Surviving Corporation. and such common stock of the Surviving Corporation issued on that conversion will constitute all of the issued and outstanding shares of capital stock of the Surviving Corporation immediately following the Effective Time.

(c)     Notwithstanding any provision contained in this Agreement to the contrary. all shares of Company Common Stock and Company Preferred Stock outstanding immediately prior to the Effective Time of the Merger and held by a holder who has not voted in favor of the Merger or consented thereto in writing and who has demanded appraisal for such shares ("Dissenting Shares") and perfected such holder's appraisal rights in accordance with the FBCA

- 21 -

(a "Company Dissenting Holder") shall not be converted into a right to receive the Merger Consideration payable in respect of such shares pursuant to Section 2.8(a) hereof, but shall, from and after the Effective Time, have only such rights as are afforded to the holders thereof by the provisions of Section 607.1320 of the FBCA, unless such Company Dissenting Holder fails to perfect or withdraws or otherwise loses such Company Dissenting Holder's right to appraisal. If, after the Effective Time of the Merger, such Company Dissenting Holder fails to perfect or withdraws or loses such Company Dissenting Holder's right to appraisal, such shares shall be treated as if they had been converted as of the Effective Time of the Merger into the right to receive the Merger Consideration payable in respect of such shares pursuant to Section 2.8(a). Company shall give Parent prompt notice of (i) any demands received by Company for appraisal of shares, withdrawals of such demands, and any other instruments served pursuant to the FBCA and received by Company and (ii) all negotiations and proceedings with respect to such demands. Company shall not, except with the prior written consent of Parent, make any payment with respect to any demands for appraisal, or offer to settle, or settle any such demands.

Section 2.9    Transactions at Closing; Exchange of Certificates; Exchange Agent.

(a)    At the Closing: (i) the parties shall cause to be delivered to the Secretary of State of the State of Florida duly executed and verified copies of the Articles of Merger as required by the FBCA to effect the Merger, and take such further actions as may be required by the FBCA to make the Merger effective upon the terms and subject to the conditions set forth in this Agreement; (ii) the parties shall use reasonable efforts to deliver to each other the respective agreements, legal opinions and other documents and instruments specified herein, including without limitation, the documents and instruments specified in Article VII to be delivered as a condition precedent to Closing; (iii) in accordance with the provisions of Section 2.10 hereof, Parent shall cause the Escrow Fund to be deposited with the Escrow Agent in immediately available funds; and (iv) in accordance with the provisions of Section 2.7(b) hereof, Parent shall cause the Closing Date Acquisition Amount to be paid in immediately available funds. All deliveries, payments and other transactions and documents relating to the Closing shall be interdependent and none shall be effective unless or until all are effective (except for any of same as to which the party entitled to the benefit thereof has expressly waived satisfaction or performance thereof as a condition precedent to the Closing).

(b)    Prior to receiving any portion of the Merger Consideration, each holder of record of a certificate or certificates that immediately prior to the Effective Time of the Merger represented issued and outstanding shares of Company Common Stock or Company Preferred Stock (the "Certificates"), shall have delivered to CitiBank, N.A., or such other exchange agent mutually acceptable to Parent and the Shareholder's Representative (the "Exchange Agent"), (i) a properly completed and duly executed letter of transmittal (which letter of transmittal shall have been previously mailed by the Exchange Agent to such holder along with instructions thereto and a notice to the effect that delivery of the Certificates (A) shall be effected, and risk of loss and title to the Certificates shall pass, only upon delivery of the Certificates to the Exchange

- 22 -

Agent and (B) unless otherwise disclosed to the Exchange Agent, shall constitute a representation and warranty by the holder thereof to Parent that such holder is the beneficial owner of the shares represented by such Certificate(s), and that such shares are owned by such holder free and clear of any and all liens or encumbrances of any kind or nature) and (ii) the Certificates held of record by such holder. The Company shall use reasonable efforts to cause to be delivered to the Exchange Agent prior to the Closing Date the Certificates evidencing the shares of the Company Common Stock and the Company Preferred Stock issued and outstanding immediately prior to the Effective Time (or in the event any Certificate shall have been lost, stolen or destroyed, an affidavit of that fact by the holder claiming such Certificate to be lost, stolen or destroyed and, if required by Parent, the execution of an unsecured indemnity agreement reasonably acceptable to Parent by such holder against any claim that may be made against it with respect to such Certificate). Upon surrender of a Certificate to the Exchange Agent (or alternatively, delivery of an affidavit and indemnity agreement reasonably acceptable to Parent), together with such letter of transmittal, duly executed, the holder of such Certificate shall be entitled to receive in exchange therefor the Merger Consideration into which the shares of Company Common Stock or shares of the Company Preferred Stock, as the case may be, theretofore represented by such Certificate shall have been converted pursuant to Section 2.8(a), and the Certificate so surrendered shall forthwith be canceled effective upon consummation of the Merger. If the portion of the Merger Consideration to be paid to a Person other than the Person in whose name the Certificate so surrendered is registered, it shall be a condition of exchange that (x) such Certificate shall be properly endorsed or otherwise in proper form for transfer and that the Person requesting such exchange shall pay any transfer or other Taxes required by reason of the exchange to a Person other than the registered holder of such Certificate or establish to the reasonable satisfaction of the Exchange Agent that such Tax has been paid or is not applicable and (y) such Person execute and deliver to Parent a certificate containing an appropriate representation regarding ownership and title to the shares represented by the applicable Certificate(s) and a corresponding unsecured indemnity agreement reasonably acceptable to Parent against any claim that may be made against it with respect to such Certificate(s). Until surrendered as contemplated by this Section 2.9, each Certificate shall be deemed as of the Effective Time of the Merger to represent only the right to receive, upon surrender of such Certificate in accordance with this Section 2.9, the Merger Consideration into which the shares represented thereby shall have been converted pursuant to Section 2.8(a).

(c)     All Merger Consideration paid upon the surrender of Certificates in accordance with the terms of this Article II shall be deemed to have been exchanged and paid in full satisfaction of all rights pertaining to the shares of Company Common Stock and Company Preferred Stock theretofore represented by such Certificates and there shall be no further registration of transfers on the stock transfer books of the Surviving Corporation of the shares of Company Common Stock or Company Preferred Stock that were issued and outstanding immediately prior to the Effective Time of the Merger. If, after the Effective Time of the Merger, Certificates are presented to the Surviving Corporation for any reason, they shall be

- 23 -

canceled and exchanged for the applicable portion of the Merger Consideration as provided in this Article II.

(d)  None of Parent. Company or the Surviving Corporation shall be liable to any former Company Shareholder for any Merger Consideration or interest thereon properly delivered to a public official pursuant to any applicable abandoned property. escheat or similar Law.

(e)  The Exchange Agent. Parent. Company or the Surviving Corporation (as appropriate) shall be entitled to deduct and withhold from consideration otherwise payable pursuant to this Agreement to any Company Shareholder such amounts as are required to be deducted and withheld with respect to the making of such payment under the Code. or any provision of state. local or foreign Tax Law. To the extent that amounts are so withheld. (i) such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Company Shareholder in respect of which such deduction and withholding was made. and (ii) the Exchange Agent. Parent. Company or the Surviving Corporation (as appropriate) shall provide to such Company Shareholders written notice of the amounts so deducted or withheld.

(f)  On the Closing Date. the Company shall to pay to the applicable parties any unpaid Transaction Expenses that are reflected in the Final Schedule 2.7(b).

Section 2.10  Escrow.

(a)  On the Closing Date. an amount equal to $65,000,000 (the "Escrow Fund") shall be deposited by Parent with CitiBank. N.A.. as escrow agent ("Escrow Agent"). pursuant to the Escrow Agreement to be entered into substantially in the form attached hereto as Exhibit 1.51. The Escrow Fund shall be comprised of three separate and distinct amounts: (i) $32,000,000 of the Escrow Fund (the "General Indemnification Escrow") shall be used to satisfy and pay Losses. if any. for which the Parent Indemnified Parties are entitled to indemnification or reimbursement pursuant to Section 8.2(a) and Section 8.2(c) hereof: (ii) $15,000,000 of the Escrow Fund (the "CP Litigation Indemnification Escrow") shall be used (A) to satisfy and pay Losses. if any. for which the Parent Indemnified Parties are entitled to indemnification or reimbursement pursuant to Section 8.2(b)(i) hereof and (B) to fund the costs and expenses to be paid by the Shareholders' Representative in connection with the defense of the claim referenced in Section 8.2(b)(i) hereof. and as provided in Section 6.11 hereof: and (iii) $18,000,000 of the Escrow Fund (the "Privacy Litigation Indemnification Escrow") shall be used (A) to satisfy and pay Losses. if any. for which the Parent Indemnified Parties are entitled to indemnification or reimbursement pursuant to Section 8.2(b)(ii) hereof and (B) to fund the costs and expenses to be paid by the Shareholders' Representative in connection with the defense of the claim referenced in Section 8.2(b)(ii) hereof. and as provided in Section 6.11 hereof. The Escrow Fund (to the extent not required for the payment of such Losses to Parent Indemnified Parties) shall also be used to secure Parent's Deferred Payment Obligations and the fees and expenses incurred by the Shareholders' Representative pursuant to Section 8.6 hereof.

- 24 -

(b) Subject to the provisions of the Escrow Agreement, and the provisions of Section 2.10(d) hereof, on the date which is three business days after the first anniversary of the Closing Date (the "General Indemnification Escrow Termination Date"), (i) the Escrow Agent shall pay to each Escrow Shareholder such Escrow Shareholder's Distributable Percentage of the General Indemnification Escrow amount, if any, remaining in escrow on the General Indemnification Escrow Termination Date (if and to the extent an equivalent amount is not otherwise paid by Parent to the Escrow Shareholders in lieu thereof), and (ii) the General Indemnification Escrow shall terminate.

(c) Subject to the provisions of the Escrow Agreement, and the provisions of Section 2.10(d) and Section 6.11 hereof, (i) the CP Litigation Indemnification Escrow shall terminate on the date (the "CP Litigation Indemnification Escrow Termination Date") which is the earlier of (x) the date which is three business days after the date on which the Indemnified CP Litigation Matter is settled or otherwise finally resolved (with respect to which and from which no appeal can be taken) or (y) the second anniversary of the Closing Date (unless an appeal is pending with regard to such matter, in which event the CP Litigation Indemnification Escrow Date shall be the date on which the Indemnified CP Litigation Matter is thereafter settled or otherwise finally resolved), and (ii) the Privacy Litigation Indemnification Escrow shall terminate on the date (the "Privacy Litigation Indemnification Escrow Termination Date") on which the Indemnified Privacy Litigation Matter is settled or otherwise finally resolved (with respect to which and from which no appeal can be taken). On the CP Litigation Indemnification Escrow Termination Date, the Escrow Agent shall pay to each Escrow Shareholder such Escrow Shareholder's Distributable Percentage of the CP Litigation Indemnification Escrow, if any, remaining in escrow on such date (if and to the extent an equivalent amount is not otherwise paid by Parent to the Escrow Shareholders in lieu thereof), and the CP Litigation Indemnification Escrow shall terminate. On the Privacy Litigation Indemnification Escrow Termination Date, the Escrow Agent shall pay to each Escrow Shareholder such Escrow Shareholder's Distributable Percentage of the Privacy Litigation Indemnification Escrow, if any, remaining in escrow on such date (if and to the extent an equivalent amount is not otherwise paid by Parent to the Escrow Shareholders in lieu thereof), and the Privacy Litigation Indemnification Escrow shall terminate.

(d) Notwithstanding the foregoing, if on the General Indemnification Escrow Termination Date, the Litigation Escrow Termination Date or the Privacy Litigation Escrow Termination Date, as the case may be, any claim by a Parent Indemnified Party has been made that could result in a Loss that is subject to indemnification pursuant to Article VIII hereof, and Parent has notified the Escrow Agent and the Shareholders' Representative of such in writing, and such claim remains unpaid, then there shall be withheld from the distribution to the Escrow Shareholders such amount of the Escrow Fund within the applicable escrow account as is reasonably necessary to cover any such Loss resulting from such pending claim in accordance with the terms of the Escrow Agreement, and such withheld amount shall either be (A) paid to Parent or (B) paid to the Escrow Shareholders (if and to the extent an equivalent amount is not otherwise paid by Parent to the Escrow Shareholders in lieu thereof) in accordance with each

- 25 -

such Escrow Shareholder's Distributable Percentage, as determined upon final resolution of such claim or claims in accordance with the terms of the Escrow Agreement and Article VIII hereof (and the escrow shall be continued in effect until such final resolution of such claim or claims).

(e)  In connection with the approval of the Merger by the Company Shareholders, the escrow contemplated hereunder and the Escrow Agreement will be approved and Morris C. Brown, c/o Greenberg Traurig, P.A., 777 South Flagler Drive, Suite 300 East, West Palm Beach, Florida 33401, will be appointed as the Shareholders' Representative to act as the agent of such Company Shareholders with respect to, and with the full power and authority to resolve, all questions, disputes, conflicts and controversies concerning Indemnity Claims pursuant to Article VIII hereof. to authorize the payments of amounts held under the Escrow Agreement related thereto, to defend, negotiate and/or settle disputes related thereto, to employ such agents, consultants and professionals, to delegate authority to its agents, and to take such actions, to grant such consents and waivers and to execute such documents on their behalf in connection with this Agreement and the Escrow Agreement as the Shareholders' Representative, in his sole discretion, deems best.

(f)  If and to the extent Parent pays amounts to the Escrow Shareholders in lieu of having equivalent amounts released from the Escrow Fund to the Company Shareholders, such amounts of the Escrow Fund shall be released to Parent.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Company represents and warrants to Parent and Merger Subsidiary as follows:

Section 3.1  Organization and Authority of Company.

Each of Company and SDS is duly organized, validly existing and in good standing under the Laws of the State of Florida. Limited is a limited company duly organized and existing under the Laws of England and Wales. Each of the Acquired Companies has full corporate power to carry on its business as it is now being conducted and to own, operate and hold under lease its assets and properties as, and in the places where, such properties and assets now are owned, operated or held. Each of the Acquired Companies is duly qualified as a foreign entity to do business, and is in good standing, in each jurisdiction where the failure to be so qualified would have or would reasonably be expected to have a Material Adverse Effect on such Person. The copies of the organizational documents of each of the Acquired Companies, which have been delivered to Parent, (a) are complete and correct and in full force and effect on the date hereof, (b) accurately reflect all material actions taken by the directors and shareholders of each Acquired Company at meetings thereof, and (c) contain true, correct and complete copies or originals of the respective minutes or consent actions of the directors and shareholders thereof.

- 26 -

and, other than is contemplated by this Agreement, no amendment or other modification has been filed, recorded or is pending or contemplated thereto.

### Section 3.2    Capitalization.

(a)    The Company's authorized equity capitalization consists of 60,000,000 shares of Company Common Stock, and 10,000,000 shares of Company Preferred Stock, of which 1,878,372 shares are designated as Company Series A Preferred Stock, 634,921 shares are designated as Company Series B Preferred Stock and 1,269,841 shares are designated as Company Series C Preferred Stock. As of the date hereof, 33,722,860 shares of Company Common Stock, 1,878,372 shares of Company Series A Preferred Stock, 634,921 shares of Company Series B Preferred Stock and 1,269,841 shares of Company Series C Preferred Stock are issued and outstanding. Such shares of Company Common Stock and Company Preferred Stock constitute all of the issued and outstanding shares of capital stock of Company as of the date hereof. All issued and outstanding shares of Company Common Stock and Company Preferred Stock (i) have been duly authorized and validly issued and are fully paid and nonassessable, (ii) are not subject to any preemptive rights, (iii) have not been issued in violation of any preemptive rights, and (iv) have not been issued in violation of any federal or state securities Laws. As of the date hereof, there are outstanding options to purchase 8,957,044 shares of Company Common Stock and outstanding warrants to purchase 2,975,663 shares of Company Common Stock. All of the Company Common Stock, Company Preferred Stock, Company Options and Company Warrants are held of record by the Company Shareholders as set forth on Schedule 1.33 attached hereto. The holders of each outstanding Company Option and each outstanding Company Warrant are listed on Schedules 3.2(a)(ii) and 3.2(a)(iii) attached hereto, respectively, and set forth opposite each name is the maximum number of shares of Company Common Stock that may be issued upon exercise of such options or warrants and the exercise price thereof.

(b)    SDS's authorized equity capitalization consists of 1,000 shares of common stock, par value $0.001 per share (the "SDS Common Stock"). As of the date hereof, 1,000 shares of SDS Common Stock are issued and outstanding, and all such issued and outstanding shares are held of record by the Company. Such shares of SDS Common Stock constitute all of the issued and outstanding shares of SDS Common Stock as of the date hereof. All issued and outstanding shares of SDS Common Stock (i) have been duly authorized and validly issued and are fully paid and nonassessable, (ii) other than as provided for by the FBCA, are not subject to any preemptive rights, (iii) have not been issued in violation of any preemptive rights and (iv) have not been issued in violation of any federal or state securities Laws.

(c)    Limited's authorized equity capitalization consists of 200 ordinary shares, nominal value £1 per share ("Limited's Ordinary Shares"). As of the date hereof, 2 shares of Limited's Ordinary Shares are issued and outstanding, and all such issued and outstanding shares are held of record by the Company. Such shares of Limited's Ordinary Shares constitute all of the issued and outstanding shares of Limited's Ordinary Shares as of the date hereof. All issued

- 27 -

and outstanding shares of Limited's Ordinary Shares (i) have been duly authorized and validly issued and are fully paid and nonassessable, (ii) other than as provided for by the Laws of England and Wales, are not subject to any preemptive rights, (iii) have not been issued in violation of any preemptive rights and (iv) have not been issued in violation of any federal, national or state securities Laws. including but not limited to the Laws of England and Wales.

(d)    Schedule 3.2(d) sets forth (i) all outstanding notes, subscriptions or other rights to purchase or acquire any capital stock of any Acquired Company (other than the Company Options and Company Warrants), the exercise or purchase price for such securities and the expiration date thereof. (ii) lists all contracts, commitments, understandings, arrangements or restrictions by which any Acquired Company is bound to sell or issue any shares of its capital stock and (iii) lists all shareholder, investor rights or other agreements affecting or relating to the voting, purchase, redemption, repurchase or transfer of any shares of capital stock of any Acquired Company (A) of which the Company has Knowledge and/or (B) to which any of the Acquired Companies is a party. None of the rights to purchase or acquire any capital stock of any Acquired Company set forth on Schedule 3.2(d) shall survive the Merger or in any respect be effective from and after the Effective Time.

(e)    The Company has provided Parent with a true, correct and complete copy of the Company ESOP, including all amendments thereto. The Company Options were issued pursuant to and in accordance with the terms and provisions of the Company ESOP.

(f)    The Final Schedule 2.7(b) delivered by Company to Parent will be, as of the Closing Date, true and correct in all material respects and properly calculate and reflect the amount of the Closing Date Acquisition Amount to be paid to each Company Shareholder.

Section 3.3    Authority Relative to this Agreement.

The execution, delivery and performance of this Agreement and of all of the other documents and instruments required hereby by Company are within the corporate power and authority of Company. The execution and delivery of this Agreement and the consummation of the Merger and of the other transactions contemplated hereby have been duly authorized by the Board of Directors of Company, and have been recommended for approval by the Board of Directors of the Company to the Company Shareholders, and no other corporate proceedings on the part of Company are necessary to authorize the execution, delivery and performance of this Agreement or to consummate the transactions contemplated hereby (other than, with respect to the Merger, the approval of this Agreement and the Plan of Merger by the Company Shareholders). This Agreement and all of the other documents and instruments required hereby have been or will be duly and validly executed and delivered by Company and (assuming the due authorization, execution and delivery hereof and thereof by the Parent and Merger Subsidiary) constitute or will constitute valid and binding agreements of Company, enforceable against Company in accordance with their respective terms, except to the extent that their enforceability

- 28 -

may be limited by applicable bankruptcy, insolvency, reorganization or other Laws affecting the enforcement of creditors' rights generally or by equitable principles.

Section 3.4    Consents and Approvals; No Violations.

Except for (i) any applicable requirements of the HSR Act and any applicable filings under state securities, "Blue Sky" or takeover Laws, (ii) the filing and recordation of the Articles of Merger with the Secretary of State of the State of Florida as required by the FBCA, and (iii) those required filings, registrations, consents and approvals listed on Schedule 3.4 attached hereto, no filing or registration with, or notice to, and no Permit, authorization, consent or approval of, any Governmental Authority or any other Person is necessary or required in connection with the execution and delivery of this Agreement by Company or for the consummation by Company of the transactions contemplated by this Agreement. Assuming that all filings, registrations, Permits, authorizations, consents and approvals contemplated by the immediately preceding sentence have been duly made or obtained, neither the execution or delivery of this Agreement by Company nor the performance of this Agreement nor the consummation of the transactions contemplated' hereby by Company will (x) conflict with or result in any breach of any provision of the respective Articles of Incorporation, Certificate of Incorporation. Bylaws or other organizational documents of the Acquired Companies, (y) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, amendment, cancellation or acceleration) under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license or other Material Contract to which any Acquired Company is a party or by which any such Person or any of the properties or assets of such Person may be bound or (z) violate in any material respect any order, writ, injunction, decree, statute, rule or regulation applicable to any Acquired Company or any of their respective properties or assets.

Section 3.5    Title to Assets; Encumbrances.

(a)      Except as set forth on Schedule 3.5 attached hereto, each of the Acquired Companies has good and valid title to, or, in the case of leased properties and assets, valid leasehold interests in, all of its material properties and assets, tangible and intangible, real, personal and mixed, movable and immovable, used for or held for use in their businesses: in each case subject to no Liens, except for (i) Liens disclosed in the Company Financial Statements, (ii) Liens consisting of zoning or planning restrictions, easements, Permits and other restrictions or limitations on the use of real property or irregularities in title thereto which do not materially detract from the value of, or materially impair the use of, such property by any Acquired Company in the operation of their respective businesses, and (iii) Liens for current Taxes, assessments or governmental charges or levies on property not yet due or which are being contested in good faith (other than Liens arising under ERISA or Code Section 412) (collectively, "Permitted Liens"). Each Acquired Company is in compliance in all material respects with the terms of all leases of tangible properties to which it is a party and under which

- 29 -

it is in occupancy, and all such leases are in full force and effect and each such Person enjoys peaceful and undisturbed possession under all such leases.

(b)    All tangible assets owned or used by any Acquired Company in the operation of their respective businesses (including all assets held by such respective Persons under leases and licenses), and that are material to the businesses of the Acquired Companies taken as a whole, are in good operating condition and repair for assets of like type and age, subject to ordinary wear and tear, and are adequate for the conduct of such businesses as currently conducted.

Section 3.6    Absence of Certain Events.

Except as set forth in Schedule 3.6 attached hereto, since December 31, 2003, the business of each of the Acquired Companies has been operated in the ordinary course and, except as disclosed by the May 31 Unaudited Financial Statements or as set forth in Schedule 3.6, none of the Acquired Companies has suffered any change in its business, assets, liabilities, financial condition or results of operations that has had or is reasonably likely to have a Material Adverse Effect on or with respect to the Acquired Companies, taken as a whole. Except as disclosed by or otherwise reflected in the May 31 Unaudited Financial Statements or on Schedule 3.6, or as otherwise specifically contemplated by this Agreement, there has not been since December 31, 2003:

(a)    any amendment or change to the Articles of Incorporation, Bylaws or other organizational documents of any Acquired Company;

(b)    any capital expenditure by any Acquired Company, either individually or in the aggregate, exceeding $500,000;

(c)    any revaluation by any Acquired Company of any of its assets;

(d)    any increase (other than increases resulting from the calculation of reserves in the ordinary course of business consistent with past practice) or change in the assumptions underlying, or methods of calculating, any reserves for bad debt, any accruals, any contingency, or other reserves;

(e)    any material labor dispute concerning any Acquired Company;

(f)    any entry by any Acquired Company into any Material Contract that cannot be terminated within 30 days without penalty;

(g)    any amendment or termination of any Material Contract to which any Acquired Company is a party or by which it is bound other than any expiration or termination in accordance with its terms;

(h)    any change in the accounting policies or practices of any Acquired Company;

- 30 -

(i)　any damage, destruction or loss, whether covered by insurance or not, of any material asset of any Acquired Company;

(j)　any material change in underwriting, pricing, actuarial or investment practices or policies;

(k)　any new, or amendment to any existing, employment, severance or consulting Contract, the implementation of, or any agreement to implement, any increase in benefits with respect to any Employee Benefit Plans, or any alteration of any Acquired Company's employment practices or terms and conditions of employment, in each case other than in the ordinary course of business consistent with past practice;

(l)　any issuance by any Acquired Company of any shares of capital stock, or any repurchase or redemption by any such Person of any shares of their respective capital stock;

(m)　any sale, lease, license or other disposition of, or execution and delivery of any agreement by any Acquired Company contemplating the sale, lease, license or other disposition of, properties and assets of such Acquired Company, other than in the ordinary course of business;

(n)　any merger or consolidation of any Acquired Company with any other Person or any acquisition by any Acquired Company of the stock or business of another Person, or any action taken or any commitment entered into with respect to or in contemplation of any liquidation, dissolution, recapitalization, reorganization or other winding up of the business or operation of any Acquired Company; .

(o)　any borrowing, agreement to borrow funds or assumption, endorsement or guarantee of Indebtedness by any Acquired Company or any termination or material amendment of any evidence of Indebtedness, or other than in the ordinary course of business and consistent with past practices;

(p)　any waiver or release of any right or claim of any Acquired Company, including any write-off or other compromise of any account receivable of any Acquired Company exceeding $500,000 in the aggregate, or any settlement of any legal claims exceeding $500,000 in the aggregate of any Acquired Company pending before any court or other tribunal;

(q)　any declaration, setting aside or payment of any dividend on, or any other distribution with respect to, the capital stock of any Acquired Company or any direct or indirect redemption, purchase or other acquisition by the Company of any capital stock of any Acquired Company or any split, combination or reclassification in respect of any shares of capital stock or membership interest of any Acquired Company, or any issuance or authorization of any issuance of any other securities in respect of, in lieu of or in substitution for shares of capital stock or membership interest of any Acquired Company;

- 31 -

(r)     any Lien imposed on any of the assets, tangible or intangible, of any Acquired Company other than Permitted Liens:

(s)     any notice or, to the Knowledge of Company, commencement or threat of any lawsuit, arbitration or proceeding against or investigation of any Acquired Company or any of their affairs;

(t)     any change in pricing or royalties set or charged by any Acquired Company to any of their customers or licensees or in pricing or royalties set or charged by Persons who have licensed Intellectual Property to any Acquired Company, except in each case, in the ordinary course of business and consistent with past practices of any Acquired Company:

(u)     any transfer or grant of any right under any license, patent, copyright, trade name, trade secret, invention or similar rights, other than pursuant to licenses made in the ordinary course of business consistent with past practice; or entry into any settlement regarding the breach or infringement of, any license, patent, copyright, trademark, tradename, trade secret, invention or similar rights, or modification of any existing rights with respect thereto:

(v)     any resignation of any officer or executive employee, or any other employee the loss of whom would be, or has had, a Material Adverse Effect on the Company Intellectual Property or the conduct of the business of the Acquired Companies:

(w)     any material increase in the salary, benefits, or other compensation of any kind whatsoever (including, without limitation, any obligation to pay severance) payable or to become payable by any of the Acquired Companies to any of its officers, directors, employees or advisors, or the declaration, payment or commitment or obligation of any kind for the payment by any of the Acquired Companies of a bonus or other additional salary or compensation to any such Person of any kind whatsoever (including without limitation, any obligation to pay severance, except in each case, in the ordinary course of business and consistent with the past practices of any of the Acquired Companies:

(x)     the commitment or agreement by any Acquired Company or, to the Knowledge of Company, by any officer or employee thereof to do any of the things described in the preceding clauses (a) through (w) (other than negotiations with Parent and its representatives regarding the transactions contemplated by this Agreement).

Section 3.7     Subsidiaries.

SDS and Limited constitute all of the direct or indirect Subsidiaries of Company and, except with respect to the aforementioned Subsidiaries and except as set forth in Schedule 3.7, Company does not, directly or indirectly, own or hold of record and/or beneficially own or hold, any shares of any class of capital stock of any corporation or any legal or beneficial ownership interest in any other Person. Except as set forth in Schedule 3.7, Company owns, directly or

- 32 -

indirectly. all the outstanding capital stock of each of its Subsidiaries. free and clear of all Liens (other than Permitted Liens). charges. security interests. pledges. options. rights of first refusal. voting proxies or other voting agreements. or encumbrances of any kind or nature. and all such capital stock is duly authorized. validly issued and outstanding. fully paid and nonassessable.

Section 3.8    Financial Statements; Available Cash at Closing.

(a)    Attached hereto as Schedule 3.8 are (i) the audited consolidated financial statements of the Company and the Acquired Subsidiaries as of December 31. 2003 and for the twelve month period then ended (the "December 31 Audited Financial Statements") and (ii) the unaudited consolidated financial statements of the Company and the Acquired Subsidiaries as of May 31. 2004 and for the five-month period then ended (the "May 31 Unaudited Financial Statements") (the December 31 Audited Statements and the May 31 Unaudited Financial Statements. collectively. the "Company Financial Statements"). The December 31 Audited Financial Statements are true and correct in all material respects and fairly present the financial condition. results of operations and cash flows of the Acquired Companies as of the date thereof and for the twelve month period then ended in conformity with GAAP applied on a consistent basis. The May 31 Unaudited Financial Statements fairly present the financial condition. results of operations and cash flows of the Acquired Companies as of the date thereof and for the five month period then ended in conformity with GAAP applied on a consistent basis. except as otherwise noted therein and subject to normally recurring year-end audit adjustments and the absence of notes.

(b)    As of the Closing Date. the Company's Available Cash at Closing shall be not less than $21.000.000 and the Transaction Expenses incurred by the Acquired Companies as of the Closing Date shall not exceed $8.500.000. For purposes hereof. the term "Available Cash at Closing" shall mean an amount. determined as of the Closing Date. equal to the Acquired Companies' (on a consolidated basis) (i) cash and cash equivalents plus (ii) Investment Securities (as valued on the Closing Date in accordance with the provisions of this Section 3.8(b)) minus (iii) the sum of (A) any unpaid capital lease obligations (current and long term portion of principal and accrued interest) arising pursuant to the UPS Capital Lease. (B) any early termination fee paid or payable by the Company in connection with the termination of the UPS Capital Lease. and (C) the "lease abandonment charge" relating to the Company's leased facility in the United Kingdom minus (iv) the Transaction Expenses incurred by the Acquired Companies in connection with the Merger. Notwithstanding anything herein to the contrary and notwithstanding GAAP. for purposes of determining the value of the Investment Securities held by the Company as of the Closing Date (and in turn for purposes of calculating the Available Cash at Closing). such securities shall be valued in an amount equal to the average closing price for such securities on the relevant stock exchange or national market system. as the case may be. for the ten trading days immediately preceding the Closing Date. The line items described in (i)-(iii) of this paragraph shall. for purposes of the calculations set forth herein. be determined with reference to the Company Financial Statements and the working papers thereto.

- 33 -

Section 3.9    Litigation.

Except for the lawsuits. arbitration proceedings. cases and matters set forth in Schedule 3.9, attached hereto, there are no civil, criminal or administrative actions, suits, claims, hearings, arbitrations, proceedings or investigations pending or, to the Knowledge of Company, threatened, against or relating to any Acquired Company, its properties or any of its officers, directors or managers, as the case may be, in their capacity as such, at law or in equity, or before any Governmental Authority.

Section 3.10   Employee Benefit Plans.

(a)   Company has made available to Parent true and complete copies of each pension, retirement, savings and profit sharing, bonus, incentive, deferred compensation, severance pay, or other employee benefit plan, fund or program within the meaning of § 3(3) of ERISA and any stock purchase agreement or arrangement, supplemental savings and profit sharing plan, bonus retention plan, non-qualified deferred compensation plan, change in control agreement or other agreement providing for termination or severance pay, and all other material employee benefits or remuneration of any kind at any time contributed to, maintained or sponsored by, any of, or on behalf of, the Acquired Companies, whether or not subject to ERISA, funded or unfunded (each, an "Employee Benefit Plan"), covering present and former employees of any Acquired Company (the "Company Employees"), all of which plans are listed on Schedule 3.10(a) attached hereto. Company has made available to Parent as to each Employee Benefit Plan a true and complete copy of (i) the most recent annual report (Form 5500) filed with the IRS, if applicable, (ii) the most recent actuarial valuation report, if applicable, (iii) each plan document and trust agreement relating to such Employee Benefit Plan; (iv) the most recent summary plan description, and (v) the most recent determination letter issued by the IRS.

(b)   Except as set forth in Schedule 3.10(b) attached hereto: (i) each Employee Benefit Plan that is an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA that is intended to qualify under § 401(a) of the Code (the "Qualified Plans") has been and is being operated and administered in compliance in all material respects with § 401(a) of the Code, and a favorable determination letter has been obtained from the IRS for each Qualified Plan, or is being requested; (ii) no Employee Benefit Plan is a multi-employer plan; (iii) there has been no material non-exempt "prohibited transaction" within the meaning of § 406 of ERISA or § 4975 of the Code involving any Employee Benefit Plan; (iv) all required employer contributions to each Employee Benefit Plan have either been made or accrued on the Company's Financial Statements; (v) each Employee Benefit Plan has been administered in material compliance with the applicable provisions of ERISA and the Code and the terms of such Employee Benefit Plan; (vi) there are no pending or, to the Knowledge of Company, threatened investigations or claims by the IRS, U.S. Department of Labor or any other governmental agency relating to any of the Employee Benefit Plans; and (vii) there are no pending or, to the Knowledge of Company, threatened termination proceedings, pending

- 34 -

claims (except claims for benefits payable in the normal operation of the Employee Benefit Plans), suits or proceedings against or involving any Employee Benefit Plan or asserting any rights to or claims for benefits under any Employee Benefit Plan, and to the Knowledge of Company, there are no existing facts that would have a Material Adverse Effect on any Acquired Company, in the event of any such investigation, claim, suit or proceeding.

(c) None of the Acquired Companies, or any trade or business, whether or not incorporated, that could be considered a single employer with any of them under Code Sections 414(a), 414(b), 414(m) or 414(o), has ever maintained, established, sponsored, participated in, or contributed to any: (i) "employee pension benefit plan" within the meaning of Section 3(2) of ERISA that is subject to Title IV of ERISA or Code Section 412 or (ii) "multiemployer plan" within the meaning of Section (3)(37) of ERISA. None of the Acquired Companies has incurred any liability under Title IV of ERISA or Code Section 412, and there are no circumstances that could be expected to result in such liability.

(d) Except as set forth in Schedule 3.10, attached hereto, no Employee Benefit Plan provides (except at no cost to any Acquired Company), or reflects or represents any liability of any Acquired Company to provide, retiree life insurance, retiree health benefits or other retiree employee welfare benefits to any Person for any reason, except as may be required by COBRA or other applicable Law.

(e) Except as set forth in Schedule 3.10 attached hereto, neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or upon the occurrence of any additional or subsequent events) constitute an event under any Employee Benefit Plan that will or may result (either alone or in connection with any other circumstance or event) in any payment (whether of severance pay or otherwise), acceleration, forgiveness of Indebtedness, vesting, distribution, increase in benefits or obligation to fund benefits with respect to Employee Benefit Plan.

(f) Except as set forth in Schedule 3.10 attached hereto, none, of the Acquired Companies has made any payments, is obligated to make any payments, or is a party to any agreement or other arrangement or understanding that could obligate it to make any payments (individually or in the aggregate) that are not or would not be deductible under Section 280G of the Code in whole or in part.

(g) The terms and provisions of the Company ESOP permit the cash out of the Company Options in the manner contemplated by this Agreement, without requiring the written consent of the holders of such Company Options. All of the Company Options have vested, or prior to or at the Effective Time will vest, in the holders thereof, in accordance with, and as permitted by the terms and provisions of, the Company ESOP.

- 35 -

Section 3.11   Labor Matters.

Except as set forth on Schedule 3.11 attached hereto. the employment of each employee of each Acquired Company is terminable at will by the employer.  None of the Acquired Companies is a party to or bound by any collective bargaining agreement or other agreement or obligation of any sort with any labor union.  There are no strikes or other work stoppages involving any employees of any Acquired Company and there are no material labor disputes by any labor organization in progress or pending or. to the Knowledge of Company. threatened against any such Person. Except as set forth on Schedule 3.11 attached hereto. none of the Acquired Companies has encountered any labor union organizing activity. nor had any actual. or to the Knowledge of Company. threatened employee strikes. work stoppages. slowdowns or lockouts. or other claims or disputes relating to any labor. safety or employment matters involving any employee. including discrimination complaints.  Each Acquired Company is in compliance in all material respects with all applicable Laws and regulations in respect of employment and employment practices. terms and conditions of employment, wages and hours. occupational safety. health or welfare conditions relating to premises occupied. and civil rights. There are no charges of unfair labor practices pending before any Governmental Authority involving or affecting any Acquired Company.

Section 3.12   Tax Matters.

Except as set forth on Schedule 3.12:

(a)  the Acquired Companies (excluding Limited) are members of the affiliated group. within the meaning of Section 1504(a) of the Code. of which Company is the common parent. and such affiliated group files a consolidated federal income Tax Return:

(b)  each Acquired Company has prepared and timely filed or caused to be prepared and filed all federal. state. local and foreign Tax Returns relating to such Acquired Company or any of its assets required to have been filed by or for it. and such Tax Returns or are in the case of Tax Returns to be filed. will be. true. correct and complete in all material respects:

(c)  Each Acquired Company has duly and timely paid all Taxes required to be paid or adequate provision therefor has been made in the Company  Financial Statements) by such Acquired Company to any taxing authority: and all Taxes shown to be due on the Tax Returns referred to in paragraph (b) above have been or will be timely paid:

(d)  Each Acquired Company has fully and properly withheld all payroll and similar Taxes with respect to its employees:

(e)  There is no Tax deficiency proposed in writing or assessed in writing against any Acquired Company that is outstanding. nor has any Acquired Company executed any waiver

- 36 -

of any statute of limitations on or extending the period for the assessment or collection of any Tax, which waiver is currently in effect;

(f)   As of the date of each of the Company Financial Statements, any and all accrued Taxes not yet due and payable as of each such date have been (to the extent required by GAAP) adequately recorded as reserves or current liabilities on the balance sheets included in the Company Financial Statements;

(g)   No Acquired Company has liability for any Taxes to any taxing authority in any jurisdiction where any such Acquired Company does not file a Tax Return, whether domestic or foreign, including without limitation, income taxes, value-added taxes and sales and use taxes; and no Acquired Company has received any written claim or notice of examination or audit from any taxing authority in a jurisdiction where any such Acquired Company does not file a Tax Return that it is or may be subject to taxation in that jurisdiction;

(h)   No audit or other examination of any Tax Return of any Acquired Company is currently in progress, nor has any Acquired Company been notified of any request for such an audit or other examination; and no Tax-related litigation or proceeding against any Acquired Company currently exists or is pending;

(i)   Parent has been provided correct and complete copies of all federal, state, local and foreign income, franchise, value-added and state sales and use Tax Returns filed by any Acquired Company since October 2000;

(j)   There are no Liens on the assets of any Acquired Company relating to or attributable to Taxes except Liens relating to current Taxes not yet due or relating to Taxes being contested in good faith as set forth and described on Schedule 3.12;

(k)   No Acquired Company is a party to a Tax Sharing Agreement or a tax indemnification agreement, or owes any amount under any such agreement;

(l)   No Acquired Company is a party to or is bound by any closing agreement or offer in compromise with any federal, state, local or foreign taxing authority;

(m)   No Acquired Company is a party to any joint venture, partnership or other arrangement that is treated as a partnership for federal income tax purposes;

(n)   No Acquired Company has agreed to make, nor is it required to make, any adjustment under Sections 481(a) or 263A of the Code or any comparable provision of state, local or foreign Tax laws by reason of a change in accounting method;

(o)   There are no requests for rulings or determinations in respect of any Tax pending between, or in respect of, any taxing authority and any Acquired Company;

- 37 -

(p) Schedule 3.12 describes all material, currently effective Tax elections, consents, and agreements made by or affecting the Company and the Acquired Companies;

(q) Schedule 3.12 lists the date of each "ownership change" (within the meaning of Section 382 of the Code) that has occurred with respect to any Acquired Company or a predecessor thereof while a "loss corporation" (within the meaning of Section 382 of the Code) prior to the date hereof, the amount of "pre-change losses" (within the meaning of Section 382 of the Code) affected by such ownership change and the Section 382 limitation applicable to such pre-change losses; and

(r) No Acquired Company (i) has been a member of an affiliated group of corporations, within the meaning of Section 1502 of the Code, filing a consolidated federal income Tax Return (other than one of which the Company was the common parent), or a member of a combined, consolidated or unitary group (including any Person other than an Acquired Company) for state, local or foreign Tax purposes; or (ii) has any liability for Taxes of any person (other than the Company and its subsidiaries) under Treasury Regulation 1.1502-6 (or any corresponding provision of state, local or foreign income Tax law), as transferee or successor, by contract or otherwise.

Section 3.13  Compliance with Law.

Each Acquired Company holds all Permits necessary for the lawful conduct of its businesses in the jurisdictions in which such Acquired Company conducts business, and is in compliance in all material respects with the terms of such Permits. Except as set forth in Schedule 3.13 attached hereto, each Acquired Company is currently in compliance, and at all times since January 1, 2001 has been in compliance, in all material respects with, and is not or has not been during such period (as applicable) in material violation of, any Law, ordinance or regulation of any Governmental Authority, and to the Knowledge of the Acquired Companies, the use of their products by their customers is in compliance in all material respects with all applicable Laws. No investigation or review by any Governmental Authority with respect to any Acquired Company is pending or, to the Knowledge of Company, threatened, nor, to the Knowledge of Company, has any Governmental Authority indicated an intention to conduct the same, nor is any Acquired Company subject to any consent decree.

Section 3.14  Employees.

(a)  The Company has provided Parent with true, correct and complete copies of each Key Employee Agreement. Except as set forth in such copies, none of such Key Employee Agreements has been amended or modified. All of the Key Employee Agreements are valid and in full force and effect as to the Company or the Acquired Subsidiaries, as the case may be, and neither the Company or the Acquired Subsidiaries nor, to the Company's Knowledge, any employee party thereto, is in material breach or violation of, or material default under, the terms of any such Key Employee Agreement.

- 38 -

(b)    To the knowledge of Company, no employee of any Acquired Company is in material violation of any term of any employment contract, patent disclosure agreement, non-competition agreement, or any restrictive covenant relating to (A) the right of any such employee to be employed by any Acquired Company because of the nature of the business conducted by any Acquired Company or (B) the use of trade secrets or proprietary information of others.

(c)    All Persons who have at any time been classified as consultants, independent contractors or service providers other than employees of the Acquired Companies (collectively, the "Consultants") have been properly so classified and excluded from classification as an employee in accordance with all applicable laws, including without limitation, ERISA and the Code and in accordance with the terms of each Employee Benefit Plan. Except as set forth in Schedule 3.14 attached hereto, each Acquired Company currently is in compliance, and at all times since January 1, 2001 has been in compliance, in all material respects with all applicable laws with respect to employment Taxes, and tax reporting associated with the Consultants and none of the current or former Consultants could be reclassified as an employee.

Section 3.15    Transactions With Affiliates.

Except as set forth on Schedule 3.15 attached hereto, since December 31, 2003, no Acquired Company has, in the ordinary course of business or otherwise, purchased, leased or otherwise acquired any material property or assets or obtained any material services from, or sold, leased or otherwise disposed of any material property or assets or provided any material services to (except with respect to remuneration for services rendered in the ordinary course as a director, officer or employee of any Acquired Company) (a) any holder of 5% or more of the voting securities of any Acquired Company, (b) any director, officer or employee of any Acquired Company, (c) any natural person or other Person that directly or indirectly controls, is controlled by or is under common control with any Acquired Company or (d) any member of the immediate family of any of such natural persons (each, a "Company Affiliate"). Except as set forth on Schedule 3.15, the Material Contracts do not include any obligation or commitment between any Acquired Company, on the one hand, and any Company Affiliate, on the other hand, and the assets of the Acquired Companies do not include any receivable or other obligation or commitment from a Company Affiliate to any Acquired Company, and no Company Affiliate has any interest in any material property, real or personal, tangible or intangible, including, without limitation, any Company Intellectual Property, used in or pertaining to the business of any Acquired Company, except for the ordinary rights of a shareholder.

Section 3.16    Fees and Expenses of Brokers and Others.

No Acquired Company is directly or indirectly committed to any liability for any brokers' or finders' fees or any similar fees in connection with the transactions contemplated by this Agreement or has retained any broker or other intermediary to act directly or indirectly on its behalf in connection with the transactions contemplated by this Agreement, except that Company has engaged CIBC World Markets Corp. to represent it in connection with such transactions, and

- 39 -

Company shall pay all the fees and expenses to which CIBC World Markets Corp. is entitled in connection with such engagement.

Section 3.17    Intellectual Property.

(a)    For purposes of this Agreement, the following terms have the following definitions:

(i)    "Intellectual Property" means any or all of the following and all rights in, arising out of or associated therewith: (A) all United States, international and foreign patents and applications therefor and all reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof; (B) all inventions (whether patentable or not), invention disclosures, improvements, trade secrets, proprietary information, know-how, technology, technical data, supplier lists and customer lists and all documentation relating to any of the foregoing; (C) all copyrights, copyright registrations and applications therefor and all other rights corresponding thereto throughout the world; (D) all trade names, logos, common law trademarks and service marks, trademark and service mark registrations and applications therefor and all goodwill associated therewith throughout the world ("Trademarks"); (E) all databases, data collections and content and all rights therein, throughout the world; (F) all computer software, including all source code, object code, firmware, development tools, files, records data, and documentation (including design documents, flowcharts and specifications therefor), and all media on which any of the foregoing is recorded; (G) all domain names, uniform resource locators and other Internet or similar addresses or identifiers ("Domain Names"); and (H) any similar, corresponding or equivalent rights to any of the foregoing and all documentation related to any of the foregoing.

(ii)    "Company Intellectual Property" shall mean any Intellectual Property that is owned or rightfully used by any Acquired Company.

(iii)    "Registered Intellectual Property" shall mean all United States, international and foreign: (a) patents; (b) registered trademarks and registered service marks (including both federal and state registrations); (c) registered copyrights; and (d) registered Domain Names.

(b)    Schedule 3.17(b) sets forth a true, correct and complete list of all (i) Registered Intellectual Property owned by any Acquired Company (the "Company Registered Intellectual Property"); (ii) applications to register any Company Intellectual Property owned by any Acquired Company; and (iii) proceedings or actions before any court, tribunal (including the United States Patent and Trademark Office (the "PTO") and any equivalent authority anywhere in the world) related to any of the Registered Intellectual Property owned by any Acquired Company. All such Company Registered Intellectual Property and all applications to register any Company Intellectual Property are in the name of such Acquired Company.

- 40 -

(c)     Except as listed on <u>Schedule 3.17(c)</u>, each item of Company Intellectual Property owned by any Acquired Company, including the Company Registered Intellectual Property, is free and clear of any Liens and any and all obligations of any Acquired Company to make payments to any other Person. Except as set forth on <u>Schedule 3.17(c)</u>, each Acquired Company owns or has the right to use all Intellectual Property necessary for the operation or conduct of its business as currently operated and conducted, including the sale or license of any products or technology, or the provision of any services, by each such Acquired Company.

(d)     Except as listed on <u>Schedule 3.17(d)</u>, to the extent that any material Intellectual Property has been developed or created by any Person, other than (i) an Acquired Company or (ii) an employee of an Acquired Company who developed or created such Intellectual Property within the scope of his or her employment with such Acquired Company, to whom an Acquired Company has, directly or indirectly, paid to develop or create such Intellectual Property, such Acquired Company has a written "work-for-hire" agreement with such Person with respect thereto pursuant to which (A) such person has assigned all rights to such Intellectual Property to such Acquired Company, and (B) such Acquired Company has obtained thereby valid ownership of, and is the exclusive owner of, all such Intellectual Property.

(e)     Except as set forth in <u>Schedule 3.17(e)</u>, no Acquired Company has (i) except for written licenses of Company Intellectual Property in the ordinary course of business consistent with past practices, granted to any other Person any license of or right to use, or (ii) transferred ownership in whole or in part to any other Person in or to, any owned Company Intellectual Property. To the Knowledge of Company, the representations and warranties made or given by any Acquired Company to any of its customers respecting any Company Intellectual Property are true and correct.

(f)     <u>Schedule 3.17(f)</u> sets forth all licenses and other written agreements (i) pursuant to which any Acquired Company licenses or otherwise is granted the right to use any Intellectual Property of any third party used in the conduct of the business of such Acquired Company, other than "shrink-wrap," "click-through" and similar widely available commercial end-user licenses and (ii) that are subject to, or pursuant to which any Acquired Company has been granted rights under, the GNU General Public License scheme or any other similar open source code or public license scheme.

(g)     Except as set forth in <u>Schedule 3.17(g)</u>, to the Knowledge of Company, no owned Company Intellectual Property infringes or misappropriates the Intellectual Property of any Person, and no Acquired Company has received written notice from any Person in the last two years (i) claiming that the conduct of any Acquired Company's business or any act, product, technology or service of any Acquired Company infringes or misappropriates the Intellectual Property of any Person or (ii) challenging the validity or effectiveness of the Intellectual Property used by the Acquired Companies in the conduct of their business, or challenging the ownership of any of the owned Company Intellectual Property.

- 41 -

(h)     Except as listed on <u>Schedule 3.17(h)</u>, each item of Company Registered Intellectual Property owned by any Acquired Company is valid and subsisting. Except as listed on <u>Schedule 3.17(h)</u>, all necessary registration, maintenance and renewal fees in connection with the Registered Intellectual Property owned by any Acquired Company have been paid and all necessary documents and certificates in connection with such Registered Intellectual Property owned by any Acquired Company have been filed with the relevant patent, copyright, trademark or other authorities in the United States or foreign jurisdictions, as the case may be, for the purposes of maintaining such Registered Intellectual Property owned by the Company. Except as listed on <u>Schedule 3.17(h)</u>, in each case in which an Acquired Company has acquired ownership of any material Intellectual Property rights from any Person, such Acquired Company has obtained a valid and enforceable assignment sufficient to transfer all rights in such Intellectual Property (including the right to seek past and future damages with respect to such Intellectual Property).

(i)     Except as listed on <u>Schedule 3.17(i)</u>, to the Knowledge of Company, there are no material contracts, licenses or agreements between any Acquired Company and any other Person with respect to Intellectual Property owned or used by any of the Acquired Companies and that is material to the operation of their respective business, taken as a whole, under which there is any material dispute of which the Company has Knowledge regarding the scope of such agreement, or performance under such agreement, including with respect to any payments to be made or received by any Acquired Company thereunder.

(j)     To the Knowledge of Company, no Person is infringing or misappropriating any Company Intellectual Property that is material to the operation of the business of the Acquired Companies; taken as a whole.

(k)     The Acquired Companies have taken reasonable steps in accordance with normal industry practice to protect their rights in confidential information and trade secrets thereof or provided by any other Person thereto.

(l)     To the Knowledge of Company, no Company Intellectual Property or product, technology or service of any Acquired Company is subject to any proceeding or outstanding decree, order, judgment, or stipulation that restricts in any manner the use, transfer or licensing thereof by any Acquired Company or may be reasonably expected to affect the validity, use or enforceability of such Company Intellectual Property.

(m)     The Acquired Companies have the right to use all source code now or previously constituting a portion of the Company Intellectual Property which is necessary to use in products being offered, or products under development, for sale or license to, or use by, the Acquired Companies or third parties.

(n)     The source code and system documentation relating to all Acquired Company software programs (i) have at all times been maintained in strict confidence, (ii) have been

- 42 -

disclosed by the Acquired Companies only to employees who have a "need to know" the contents thereof in connection with the performance of their duties to the Company and who have executed the agreements referred to in Section 3.17(d) above, and (iii) have not been disclosed to any third party not under an obligation to maintain the confidential nature of such information.

(o)     Except as set forth in <u>Schedule 3.17(o)</u>, neither the execution or performance of this Agreement, nor the transactions contemplated by this Agreement, will result in (i) the termination of any licenses pursuant to which an Acquired Company obtains Intellectual Property for use in its business, or an increase in the royalties or license fees payable by an Acquired Company thereunder, (ii) any Acquired Company granting to any third party any right to or with respect to any Intellectual Property owned by, or licensed to, any Acquired Company, or (iii) any Acquired Company being bound by, or subject to, any non-compete or other restriction on the operation or scope of its business.

Section 3.18    Insurance.

<u>Schedule 3.18</u> contains a complete and correct list of all policies of insurance and fidelity bonds owned or held by any Acquired Company. The Company has provided to Parent true, correct and complete copies of the insurance policies and fidelity bonds listed on <u>Schedule 3.18</u>. All such policies (a) are in full force and effect with all premiums due having been paid in full and are sufficient for compliance by the Acquired Companies with all requirements of Law and all agreements to which such Persons are a party, (b) are valid, outstanding and enforceable policies, (c) insure against risks of the kind customarily insured against by companies in Company's business and (d) provide that they will remain in full force and effect through the respective dates set forth on <u>Schedule 3.18</u>, subject to the cancellation rights specified in such policies. All premiums due and payable under all such policies and bonds have been paid and each Acquired Company is otherwise in material compliance with the terms of such policies or bonds. Except as set forth on <u>Schedule 3.18</u>, during the last two years, Company has not been denied any insurance coverage which it has requested, has made no material change in the scope or nature of its insurance coverage and has not received notice of any material increase in premiums for any of such policies nor of any termination or refusal to renew such policies. All policies of primary comprehensive general liability insurance and excess carriers insurance which Company has maintained during the past two years are set forth on <u>Schedule 3.18</u>. During the past two years, there has been no lapse in coverage of the insurance carried by Company in the ordinary course of its business.

Section 3.19    Material Contracts.

(a)     <u>Schedule 3.19(a)</u> sets forth a true, correct and complete list of each and every Material Contract, specifying in each case for each Material Contract the name of the Contract, the full, correct and complete name of all the parties thereto as reflected therein, the date of the Contract and, if applicable, the date of any amendments thereto.

- 43 -

(b)     Except as set forth on <u>Schedule 3.19(b)</u> hereto. all Material Contracts are valid. binding and in full force and effect as to the Company or its Subsidiaries. and neither the Company or its Subsidiaries nor. to the Company's knowledge. any other party thereto. is in material breach or violation of. or material default under. nor. to the Knowledge of the Company. is there any reasonable basis for a claim of such material breach or violation by the Company or its Subsidiaries or such material default by the Company or its Subsidiaries under. the terms of any such Material Contract. and no event has occurred which constitutes or. with the lapse of time or the giving of notice or both. would constitute. such a material breach. violation or default by the Company or its Subsidiaries thereunder. The Company has made available to Parent true. correct and complete copies of each of the Material Contracts.

Section 3.20   Real Property.

No Acquired Company has ever owned. or currently owns. any real property. Except as set forth in <u>Schedule 3.20</u>. each Acquired Company has valid and existing leasehold interests in all of the real property that it possesses. operates or occupies (or has similar rights to possess. operate or occupy) pursuant to any lease. sublease or other occupancy agreement (the "<u>Real Property Leases</u>"). <u>Schedule 3.20</u> contains a list of all Real Property Leases. Except as set forth in <u>Schedule 3.20</u>. each Real Property Lease is valid. binding. in full force and effect and enforceable against the Acquired Company that is a party thereto in accordance with its terms. except to the extent that its enforceability may be limited by applicable bankruptcy. insolvency. reorganization or other Laws affecting the enforcement of creditors' rights generally or by equitable principles. The leasehold estate created by each Real Property Lease is free and clear of all Liens other than Permitted Liens. No Acquired Company is in material breach or default under any Real Property Lease. To the Knowledge of Company. no material breach or default under any such Real Property Lease by any party thereto other than an Acquired Company. has occurred.

Section 3.21   No Undisclosed Liabilities.

All material liabilities or obligations of each of the Acquired Companies as of the date hereof, whether absolute or contingent. known or unknown. and whether due or to become due (including without limitation. any "loss contingency" which is either "probable" or "reasonably possible" as all such terms are defined in the Statement of Financial Accounting Standards No. 5 of the Financial Accounting Standards Board) are reflected or reserved for in the Company Financial Statements. other than (a) liabilities or obligations incurred in the ordinary course of the business of the Acquired Companies since May 31. 2004. and (b) liabilities and obligations set forth on <u>Schedule 3.21</u>.

Section 3.22   Restrictions on Business Activities.

Except as set forth on <u>Schedule 3.22</u>. there is no agreement (non-compete or otherwise). commitment. judgment. injunction. order or decree to which any Acquired Company is a party or

- 44 -

otherwise binding upon any Acquired Company which has or reasonably could be expected to have the effect of prohibiting or impairing in any material respect any business practice of. or the conduct of business by. any Acquired Company. any acquisition or disposition of property (tangible or intangible) by any Acquired Company. or the freedom of any Acquired Company to engage in any line of business or to compete with any other Person. Without limiting the foregoing. no Acquired Company has entered into any agreement which is still in effect under which it is (a) restricted from selling. licensing or otherwise distributing any of its technology or products to any customer or class of customers. (b) required to buy from. license or otherwise acquire any technology. Intellectual Property. data or content from any vendor or class of vendors. in any geographic area. during any period of time or in any segment of the market. or (c) required to sell. license or otherwise distribute its technology or products to any customer or class of customers at prices guaranteed to be lower than those charged to any other customer.

Section 3.23   Corporate Names.

No Acquired Company has used any corporate name. trade name or fictitious name other than those set forth. for each such Acquired Company. on Schedule 3.23.

Section 3.24   Bank Accounts.

Schedule 3.24 sets forth a full. correct and complete list of each bank account. safety deposit boxes. credit management and brokerage account maintained by any Acquired Company. together with all account numbers and authorized users and signatures.

Section 3.25   Certain Practices.

The Company has complied in all material respects with the U.S. Foreign Corrupt Practices Act (or similar Laws outside the United States). None of the Acquired Companies. nor. to the Knowledge of the Company. any director. officer. employee or agent of any Acquired Company. has. directly or indirectly. (i) made any payment. provided services or given or agreed to give any gift or similar benefit or other favors in the United States or in any foreign country in a manner that violated any Law and in order to obtain preferential treatment or consideration by any supplier or Governmental Authority with respect to any aspect of the business of the Acquired Companies. (ii) used funds or other assets of any Acquired Company. or made any promise or undertaking in such regard. for any other illegal payments to or for the benefit of any Person or the establishment or maintenance of a secret or unrecorded fund. or (iii) made any political contributions that would not be lawful under the laws of the United States. any foreign country or any jurisdiction within the United States or any foreign country. There have been no false or fictitious entries made in the books or records of the Acquired Companies relating to any such illegal payment or secret or unrecorded fund. No Acquired Company. nor. to the Knowledge of Company any director. officer. employee or agent of any Acquired Company. has been or is the subject of any investigation by any Governmental Authority in connection with any such illegal payment. provision of services or contribution.

- 45 -

# ARTICLE IV

## REPRESENTATIONS AND WARRANTIES
### OF PARENT AND MERGER SUBSIDIARY

Parent and Merger Subsidiary represent and warrant to Company, jointly and severally, as follows:

### Section 4.1    Organization and Authority of the Parent.

Parent is duly organized, validly existing and in good standing under the Laws of the Commonwealth of Massachusetts. Merger Subsidiary is duly organized, validly existing and in good standing under the Laws of the State of Florida. Parent owns 100 shares of common stock, par value $0.01 per share, of Merger Subsidiary, which shares represent all of the issued and outstanding capital stock of Merger Subsidiary. Merger Subsidiary has not engaged in any activities and does not hold any assets except (in each case) as necessary to be a party to and consummate the Merger.

### Section 4.2    Authority Relative to this Agreement.

The execution, delivery and performance of this Agreement and of all of the other documents and instruments required hereby by Parent and Merger Subsidiary are within the corporate power and authority of Parent and Merger Subsidiary. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by the Boards of Directors of Parent and Merger Subsidiary and no other corporate proceedings or shareholder action on the part of Parent or Merger Subsidiary are necessary to authorize the execution, delivery and performance of this Agreement or to consummate the transactions contemplated hereby. This Agreement and all of the other documents and instruments required hereby have been or will be duly and validly executed and delivered by Parent and Merger Subsidiary, as applicable, and (assuming the due authorization by Company and the authorization, execution and delivery hereof and thereof by Company) constitute or will constitute valid and binding agreements of Parent and Merger Subsidiary, enforceable against Parent and Merger Subsidiary in accordance with their respective terms, except to the extent that their enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other Laws affecting the enforcement of creditors' rights generally or by equitable principles.

### Section 4.3    Consents and Approvals; No Violations.

Except for (i) any applicable requirements of the HSR Act and any applicable filings under state securities, "Blue Sky" or takeover Laws, (ii) the filing and recordation of the Articles of Merger with the State Corporation Commission of the State of Florida as required by the FBCA, (iii) any applicable requirements and filings under the Exon-Florio Amendment, and

- 46 -

(iv) those required filings. registrations. consents and approvals listed on Schedule 4.3 attached hereto. no filing or registration with. or notice to. and no Permit. authorization. consent or approval of. any Governmental Authority or any other Person is necessary or required in connection with the execution and delivery of this Agreement by Parent or Merger Subsidiary or for the consummation by Parent and Merger Subsidiary of the transactions contemplated by this Agreement. Assuming that all filings. registrations. Permits. authorizations. consents and approvals contemplated by the immediately preceding sentence have been duly made or obtained. neither the execution or delivery of this Agreement by Parent and Merger Subsidiary nor the performance of this Agreement nor the consummation of the transactions contemplated hereby by Parent and Merger Subsidiary will (x) conflict with or result in any breach of any provision of the respective Articles of Incorporation. Certificate of Incorporation. Bylaws or other organizational documents of Parent or Merger Subsidiary. (y) result in a violation or breach of. or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination. amendment. cancellation or acceleration) under. any of the terms. conditions or provisions of any note. bond. mortgage. indenture. license. Contract or other instrument or obligation to which either of Parent or Merger Subsidiary is a party or by which either Parent or Merger Subsidiary or any of the properties or assets of any of Parent or Merger Subsidiary may be bound or (z) violate any order. writ. injunction. decree. statute. rule or regulation applicable to either Parent or Merger Subsidiary or any of the properties or assets of Parent or Merger Subsidiary.

Section 4.4    Litigation.

There is no action. suit. proceeding or investigation pending or. to the Knowledge of Parent. threatened against or relating to Parent or Merger Subsidiary at law or in equity. or before any Governmental Authority. that seeks restraint. prohibition. damages or other relief in connection with this Agreement or the consummation of the transactions contemplated hereby.

Section 4.5    Fees and Expenses of Brokers and Others.

Neither Parent nor Merger Subsidiary is directly or indirectly committed to any liability for any brokers' or finders' fees or any similar fees in connection with the transactions contemplated by this Agreement or has retained any broker or other similar intermediary to act directly or indirectly on its behalf in connection with the transactions contemplated by this Agreement.

Section 4.6    Due Diligence.

Parent has reviewed this Agreement (including the Schedules hereto) and each document referenced in the Schedules made available by the Acquired Companies. Based on the foregoing. Parent has no actual knowledge that any of Company's representations or warranties in this Agreement are inaccurate or incomplete.

- 47 -

Section 4.7    Availability of Funds.

Parent has cash available or has existing borrowing facilities that together are sufficient and available to enable Parent to consummate the transactions contemplated by this Agreement.

Section 4.8    No Additional Representations.

Each of Parent and Merger Subsidiary acknowledges that none of the Company Shareholders, the Company or any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Company, the Acquired Subsidiaries, or any Company Shareholder, except as expressly set forth in this Agreement and further agrees that none of the Company Shareholders, the Company or any other Person will be subject to any liability to Parent, Merger Subsidiary or any other Person resulting from the distribution to Parent or Merger Subsidiary, or Parent or Merger Subsidiary's use of, any such information, including, without limitation, any information document or material made available to Parent or Merger Subsidiary or its representatives in the "data room," management presentations or any other form in expectation of the transactions contemplated by this Agreement.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE III, NEITHER THE COMPANY SHAREHOLDERS NOR THE COMPANY MAKE ANY REPRESENTATION OR WARRANTY EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE COMPANY SHAREHOLDERS OR THE COMPANY, THE ACQUIRED SUBSIDIARIES OR ANY OF THE ASSETS, LIABILITIES OR OPERATIONS OF THE COMPANY OR THE ACQUIRED SUBSIDIARIES, INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE OR THE VIABILITY OR LIKELIHOOD OF SUCCESS OF THE BUSINESS, AND PARENT AND MERGER SUBSIDIARY EXPRESSLY DISCLAIMS ANY SUCH REPRESENTATION OR WARRANTY.

Section 4.9    Disclaimer Regarding Estimates and Projections.

In connection with Parent's and Merger Subsidiary's investigation of the Company, Parent and Merger Subsidiary has received from or on behalf of the Company Shareholders and/or the Company certain estimates, forecasts, plans and financial projections.  Each of Parent and Merger Subsidiary acknowledges that there are uncertainties inherent in attempting to make such estimates, forecasts, plans and financial projections, that each of Parent and Merger Subsidiary is familiar with such uncertainties that each of Parent and Merger Subsidiary is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, forecasts, plans and financial projections so furnished to it (including the reasonableness of the assumptions underlying such estimates, forecasts, plans, and financial projections), and that each of Parent and Merger Subsidiary shall have no claim against the Company Shareholders or the Company with respect thereto.  Accordingly, neither the Company Shareholders nor the Company make any representation or warranty with respect to such estimates, forecasts, plans and financial projections (including any such underlying assumptions).

- 48 -

# ARTICLE V

## COVENANTS RELATING TO CONDUCT OF BUSINESS

Section 5.1    Operation in the Ordinary Course.

During the period from the date of this Agreement to the Effective Time of the Merger. unless Parent shall otherwise consent in writing. which consent shall not be unreasonably withheld. and except as otherwise expressly contemplated or permitted by this Agreement. Company shall. and shall cause each of the Acquired Subsidiaries to. operate its business solely in the ordinary course. consistent with past practice and in good faith with the goal of preserving intact its assets (including its goodwill) and current business organizations. keeping available the services of its current officers and employees. maintaining the Material Contracts and preserving its relationships with customers. suppliers. creditors. distributors. licensors. licensees. brokers. agents and others with whom it has business dealings.

Section 5.2    Affirmative and Negative Covenants.

Without limiting the generality of Section 5.1. and except as otherwise expressly contemplated by this Agreement. or as agreed to in writing by Parent. Company shall use commercially reasonable efforts to maintain in full force and effect all insurance policies listed on Schedule 3.18. and Company shall not:

(a)    issue. sell or grant any shares of capital stock of any class. or any securities or rights convertible into. exchangeable for. or evidencing the right to subscribe for any shares of capital stock. or any rights. warrants. options. calls. commitments or any other agreements of any character to purchase or acquire any shares of capital stock or any securities or rights convertible into. exchangeable for. or evidencing the right to subscribe for. any shares of capital stock or any other securities in respect of. in lieu of. or in substitution for. shares outstanding on the date hereof (other than the issuance of shares of Company Common Stock upon the exercise of Company Options or Company Warrants outstanding on the date of this Agreement in accordance with their present terms);

(b)    (i) split. combine. subdivide or reclassify any shares of its capital stock or (ii) declare. set aside for payment or pay any dividend. or make any other distribution in respect of. any of its capital stock. or redeem or repurchase any of its capital stock or any outstanding options. warrants or rights of any kind to acquire any shares of. or any outstanding securities that are convertible into or exchangeable for any shares of its capital stock. except for redemptions or repurchases from current or former employees that do not exceed. at fair market value. $500.000 in the aggregate:

- 49 -

(c)     adopt any amendments to its Articles of Incorporation or Bylaws or effect or become a party to any recapitalization or similar transaction, except as provided by this Agreement:

(d)     other than borrowings by Company in the ordinary course incur any additional Indebtedness for money borrowed or guarantee any such Indebtedness of another Person:

(e)     acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of, or by any other manner, (i) any business or any corporation, limited liability Company, partnership, joint venture, association or other business organization or division thereof or (ii) any assets that, individually or in the aggregate, are material to Company;

(f)     except in the ordinary course of business and as provided by this Agreement, sell, lease, license or otherwise encumber or subject to any Lien (other than Permitted Liens) or otherwise dispose of any of its material properties or assets:

(g)     make or agree to make any material capital expenditures other than in the ordinary course of business that, when added to all other capital expenditures made on behalf of the Acquired Companies since the date hereof, exceeds $500,000 in the aggregate without the express written consent of Parent (which consent will not be unreasonably withheld):

(h)     except in the ordinary course of business, (i) enter into any Contract relating to the purchase of goods, equipment or services of amounts in excess of $500,000 per year or having a duration in excess of one year (excluding purchase orders entered into from time to time in the ordinary course of business), or (ii) modify, amend or transfer in any respect or terminate any Material Contract or waive, release or assign any rights or claims thereunder:

(i)     (i) except as may be required by Law, adopt or amend any bonus, profit sharing, compensation, stock option, pension, retirement, deferred compensation, employment or other employee benefit plan, agreement, trust, fund or other arrangement (including any Employee Benefit Plan) for the benefit or welfare of any employee, officer, director or service provider or former director, employee, officer or service provider, or (ii) except as provided in an existing Employee Benefit Plan and except in the ordinary course of business, increase the compensation or fringe benefits of any such individuals or pay any benefit not required by any existing plan, arrangement or agreement, or (iii) terminate or amend in any material respect any Key Employee Agreement (other than by reason of the voluntary resignation of a key employee party thereto):

(j)     except as may be required by GAAP or applicable Law, make any change to its accounting methods, principles or practices or to the Company Financial Statements:

(k)     (i) pay, discharge, settle or satisfy any claims, liabilities or obligations in excess of $500,000 in the aggregate, other than the payment, discharge or satisfaction in the ordinary

- 50 -

course of business or as required by their terms as in effect on the date hereof of claims. liabilities or obligations reflected or reserved against in the December 31 Audited Financial Statements (or the notes thereto) or incurred since the date of such financial statements in the ordinary course of business. (ii) waive. release. grant or transfer any right of material value other than in the ordinary course of business or (iii) commence any legal proceedings other than in the ordinary course of business: .

    (l)    renew any Real Property Lease: or

    (m)    authorize any of. or commit. resolve or agree to take any of. the foregoing actions.

<h3 align="center">ARTICLE VI</h3>

<h3 align="center">ADDITIONAL AGREEMENTS</h3>

Section 6.1    <u>Access to Information and Employees.</u>

    (a)    Upon reasonable notice. subject to applicable antitrust Laws and regulations relating to the exchange of information. Company shall. and shall cause each of the Acquired Subsidiaries to. afford to the officers. employees. accountants. counsel and other representatives of Parent. reasonable access during normal business hours during the period from the date hereof to the Effective Time of the Merger. to all of the properties. books. contracts. commitments and records of the Company and the Acquired Companies. and during such period. Company shall furnish promptly to Parent all information concerning its business. properties and personnel as Parent may reasonably request: *provided. however.* that notwithstanding the foregoing provisions of this Section 6.1 or any other provision of this Agreement. none of the Acquired Companies shall be required to provide to Parent (i) any information that is subject to a confidentiality agreement and that relates to a party other than any of the Acquired Companies or (ii) documents or other information subject to attorney-client privilege. Parent agrees that it will not. and it will cause its representatives not to. use any information obtained pursuant to this Section 6.1 for any purpose unrelated to the consummation of the transactions contemplated by this Agreement. The Confidentiality Agreement. dated as of June 14. 2004 (the "Confidentiality Agreement"). by and between Company and Parent. shall apply with respect to information furnished by Company and its representatives thereunder or hereunder and any other activities contemplated thereby or hereby. until the Effective Time. Parent and Merger Subsidiary covenant and agree that prior to the Effective Time none of their officers. directors. employees or agents shall contact any customer of the Company or any of the Acquired Subsidiaries without the prior written consent of the Chief Executive Officer. Chief Financial Officer or General Counsel of Company.

    (b)    Upon request by Parent and reasonable notice. Company shall. and shall cause each of the Acquired Subsidiaries to. afford Parent and its representatives reasonable access during normal business hours during the period from the date hereof to the Effective Time of the

- 51 -

Merger, to the officers and employees of the Company and the Acquired Subsidiaries, for the purpose of negotiating post-closing employment arrangements.

Section 6.2    Notice to the Company Shareholders of the Merger.

As soon as may be reasonably practicable, but not later than two (2) business days after the date hereof, the Company shall distribute notice to each of the Company Shareholders (a) that the Board of Directors of the Company has approved the Merger, and has recommended the Merger for approval by the Company Shareholders, and (b) that appraisal rights are available for any or all shares of capital stock of the Company held by such Company Shareholders, in accordance with the provisions of Section 607.1320 of the FBCA (the "Shareholder Notice"). Company shall use reasonable efforts to obtain as many votes as possible in favor of the Merger from the holders of each class of the capital stock of the Company. To the extent the Company seeks to obtain Company Shareholder approval of the Merger by written consent, such Shareholder Notice shall also include the proposed written consent of Shareholders of the Company, together with all other documents and information required by applicable law to be furnished at the time the Company solicits shareholder consents. The Company shall permit counsel for Parent to review such notice within a reasonable period of time prior to the date of the making of such notification. In connection with such notification, Parent shall provide to the Company and its counsel such information concerning Parent, for inclusion in the notification, as the Company and its counsel may reasonably request. The Company shall also keep Parent reasonably apprised of the status of the shareholder approval process and, to the extent such approvals are to be secured by written consent, shall furnish Parent with periodic updates of the written consents actually received by the Company after the date hereof.

Section 6.3    Reasonable Best Efforts; Notification; Hart-Scott-Rodino Act and Exon-Florio Filings.

(a)       Upon the terms and subject to the conditions set forth in this Agreement, except to the extent otherwise required by United States regulatory considerations and otherwise provided in this Section 6.3, each of Company and Parent agrees to use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Merger, and the other transactions contemplated by this Agreement, including (i) the obtaining of all necessary actions or nonactions, waivers, consents and approvals from Governmental Authorities and the making of all necessary registrations and filings (including filings with Governmental Authorities) and the taking of all reasonable steps as may be necessary to obtain an approval or waiver from, or to avoid an action or proceeding by, any Governmental Authority, including but not limited to under or in accordance with any applicable competition Law in any foreign nation, (ii) the obtaining of all necessary consents, approvals or waivers from third parties, (iii) the defending of any lawsuits or other legal proceedings, whether judicial or administrative, challenging this

- 52 -

Agreement or the consummation of the transactions contemplated hereby, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Authority vacated or reversed and (iv) the execution and delivery of any additional instruments necessary to consummate the transactions contemplated by this Agreement.

(b)    Without limiting the generality of the foregoing, as soon as may be reasonably practicable, and in no event later than 10 business days after the date hereof, Parent and the Company each shall file with the United States Federal Trade Commission (the "FTC") and the Antitrust Division of the United States Department of Justice (the "DOJ") Notification and Report Forms relating to the transactions contemplated herein as required by the HSR Act, as well as comparable pre-merger notification forms required by the merger notification or control laws and regulations of any applicable jurisdiction, as agreed to by the parties.  Parent and the Company each shall promptly (i) supply the other with any information which may be required in order to effectuate such filings and (ii) supply any additional information which reasonably may be required by the FTC, the DOJ or the competition or merger control authorities of any other jurisdiction and which the parties may reasonably deem appropriate, and each will use reasonable efforts to obtain a waiver of the applicable waiting period and will make any further filings pursuant thereto that may be necessary, proper or advisable in connection therewith.

(c)    Without limiting the generality of Section 6.3(a), as soon as may be reasonably practicable, and in no event later than 10 business days after the date hereof, Parent and the Company shall submit a voluntary joint filing and requested supplemental information (collectively, the "Joint Filing") to the Committee on Foreign Investment in the United States ("CFIUS") pursuant to the Exon-Florio Amendment.  Parent shall take primary responsibility for preparation and submission of the Joint Filing and any supplemental information.  Company shall cooperate with Parent in the preparation and submission of the Joint Filing and promptly provide all requisite information in order for Parent to complete the preparation and submission of the Joint Filing.

Section 6.4    Fees and Expenses.

Except as provided in Section 9.3(b) hereof, whether or not the Merger is consummated, each of the parties hereto shall bear its own expenses in connection with the negotiation and execution of this Agreement, including, without limitation, all fees and expenses of its legal counsel, investment bankers, financial advisors and accountants.

Section 6.5    Public Announcements.

Parent and Company will consult with each other before issuing any press release or otherwise making any public statements with respect to the transactions contemplated by this Agreement and shall not issue any such press release or make any such public statement prior to giving each party the opportunity to review and comment on such press release or public

- 53 -

statement. The parties agree that the initial press release or releases to be issued in connection with the execution of this Agreement shall be mutually agreed upon prior to the issuance thereof.

### Section 6.6    Maintenance of D&O Insurance.

Parent or the Surviving Corporation (or any successor to or assign of the Surviving Corporation) shall maintain Company's existing officers' and directors' liability insurance ("D&O Insurance") for a period of not less than six years after the Effective Time; provided, that, Parent or the Surviving Corporation may substitute therefor policies of substantially equivalent coverage and amounts containing terms no less favorable to such former directors or officers. The provisions of the Articles of Incorporation and Bylaws of the Surviving Corporation relating to indemnification of directors and officers shall be substantially identical to the provisions of the Articles of Incorporation and Bylaws of Company relating to indemnification of directors and officers and shall not be amended, repealed or otherwise modified in any manner adverse to the directors or officers of Company until at least six years following the Effective Time. In satisfying its obligations under this Section 6.6, the Parent or Surviving Corporation shall not be obligated to pay premiums in excess of 200% of the annualized premium for such policy based on the rate thereof as of the date of this Agreement. If, during such six-year period, such insurance coverage cannot be obtained at all or can be obtained only for an amount in excess of 200% of the Company's annual premium therefore, the Parent or Surviving Corporation shall cause to be obtained as much insurance as can be obtained for an amount equal to 200% of the Company's annual premium on the date of this Agreement, on terms not less favorable than those in effect on the date hereof in terms of coverage and amounts.

### Section 6.7    Solvency.

Parent and Merger Subsidiary agree for the benefit of the directors of Company to take all actions necessary to ensure that immediately following the Effective Time, the Surviving Corporation will be solvent for all purposes under federal bankruptcy and applicable fraudulent transfer and fraudulent conveyance Laws.

### Section 6.8    Company Warrants; Company Options; Certain Other Rights

(a)    Company Warrants.

(i)    Schedule 6.8(a) sets forth, as part thereof, all Company Warrants held by any Person as of the date of this Agreement. In connection with the Merger, each of the In-the-Money Warrants shall be converted into the right to receive the Per Warrant Merger Consideration. Each of the Out-of-the-Money Warrants, if any, shall be immediately extinguished and terminated as of the Closing without the payment of any consideration therefor and the holders of any such Out-of-the-Money Warrants shall have no further rights with respect thereto.

- 54 -

(ii)     Prior to the Closing. the Company shall exercise its commercially reasonable efforts to cause any agreements relating to the Company Warrants to be amended. if amendment shall be required. such that the In-the-Money Warrants can be and shall be. in accordance with the terms of such agreements. as so amended. converted to the right to receive the Per Warrant Merger Consideration in the manner set forth in this Section 6.8(a).  The Company shall permit counsel for Parent to review such amendments within a reasonable time prior to the making of such amendments.

(iii)     Parent covenants and agrees that it shall cause the Surviving Corporation to pay the Per Warrant Closing Merger Consideration with respect to each In-the-Money Warrant on the first business day after the Closing Date as provided in Section 2.7(b)(iii) hereof.

(b)     Company Options.

(i)     Schedule 6.8(b) sets forth. as part thereof. all Company Options held by any Person as of the date of this Agreement.  In connection with the Merger. all of the In-the-Money Options shall be converted into the right to receive the Per Option Merger Consideration. Each of the Out-of-the-Money Options. if any. shall be immediately extinguished and terminated as of the Closing without payment of any consideration therefor and the holders of any such Out-of-the-Money Options shall have no further rights with respect thereto.  Prior to or at the Closing Date. the Company shall terminate the Company ESOP. and the Surviving Corporation shall not assume any liabilities under the Company ESOP.

(ii)     Parent covenants and agrees that it shall cause the Surviving Corporation to pay the Per Option Closing Merger Consideration with respect to each In-the-Money Option on the first business day after the Closing Date as provided in Section 2.7(b)(ii).

(c)     Certain Stock Rights.

(i)     Prior to Closing. the Company shall issue 3.000 Company Options to Charles Morton in accordance with the terms of that certain offer letter dated May 17. 2004 delivered by the Company to such employee.

(ii)     Prior to Closing. the Company shall issue all Company Common Stock reserved for issuance to members of the Board of Directors of the Company who have elected to defer receipt of such stock or that has otherwise vested in accordance with the Company's Board Compensation Plan.

Section 6.9     Employee Benefits Matters.

(a)     Parent hereby agrees that. for twelve (12) months following the Effective Time. it shall (or shall cause Company to) continue to provide employee benefit and compensation plans. programs. contracts and arrangements for the benefit of the employees of the Company and the

- 55 -

Acquired Subsidiaries as of the Effective Time that, in the aggregate, will provide benefits and compensation that are substantially comparable to the benefits and compensation provided to such employees immediately prior to the Effective Time.

(b)     With respect to any employee benefit plans primarily for US-based employees of Parent or its Subsidiaries in which employees of any Acquired Company (other than Limited) as of the Effective Time first become eligible to participate after the Effective Time (the "Parent Plans"). Parent shall provide or cause to be provided to such employees: (i) full credit for years of service with an Acquired Company (including any service with predecessor entities) prior to the Merger for purposes of eligibility to participate and vesting, but not for benefit accrual or the amount of benefits, to the extent such credit was given to such employee under the comparable Company Employee Benefit Plan prior to the Merger. (ii) participation in such Parent Plans on terms no less favorable than those offered by Parent or its Affiliates to similarly situated employees of Parent or its Affiliates, and (iii) any and all preexisting conditions limitations (to the extent such limitations did not apply to such employee under the Company Employee Benefit Plan prior to the Effective Time) to be waived, and waiver of eligibility waiting periods under any group health plans with respect to such participants and their eligible dependents to the extent waived for such employee under the Company Employee Benefit Plan prior to the Effective Time. Notwithstanding the foregoing, Parent shall provide US-based employees of the Acquired Companies as of the Effective Time who become eligible on or after the Effective Time to participate in the Reed Elsevier US Retirement Plan (the "Cash Balance Plan") with credit for up to (but not more than) five years of service with the Acquired Companies prior to the Effective Time for purposes of calculating future annual contributions (i.e., for purposes of calculating the percentage of pay when calculating future annual contributions) to be made on behalf of such eligible employees under such Cash Balance Plan. In no event shall any credit be given under this Section for any service to the extent it would result in the duplication of benefits for the same period of service. Parent agrees that, after the Closing Date, all employees of the Company that are based in the UK shall be entitled to the same employee benefits as other similarly situated employees of the LexisNexis UK division of Reed Elsevier (UK) Limited (Parent's UK Affiliate) engaged in the legal information business.

Section 6.10     Certain Tax Matters.

(a)     Pre-Closing Cooperation. Until the Closing Date:

            (i)     The Company shall prepare and file, or cause to be prepared and filed, with the appropriate Governmental Authority all federal, state, local and foreign Tax Returns required to be filed (taking into account extensions) by or with respect to any Acquired Company on or prior to the Closing Date; and

            (ii)     If any Acquired Company receives any written notice from any taxing authority relating to an audit (whether pending or threatened) of any Tax Return filed by an Acquired Company or proposing an adjustment to any Tax payable by an Acquired Company,

- 56 -

the Company shall give prompt written notice thereof to Parent, which notice shall either describe in reasonable detail the audit or proposed adjustment or be accompanied by a copy of the written notice from the taxing authority.

(b)    Purchase Price Allocation. For all Tax purposes, the parties shall allocate all of the consideration to be paid pursuant to Section 2.7 to the Company Common Stock, the Company Preferred Stock, the Company Options and the Company Warrants, and not to any other agreements or obligations. Any payments made under Article VIII shall be treated for all Tax purposes as an adjustment to the purchase price for the Company Common Stock, the Company Preferred Stock, the Company Options and the Company Warrants.

Section 6.11    Defense of Indemnified Litigation Matters.

(a)    The parties agree that, from and after the Closing Date and (i) until the CP Litigation Assumption Date, the Shareholders Representative, on behalf of all of the Company Shareholders and the Surviving Corporation, will assume primary responsibility and control of the defense, prosecution (if applicable with respect to any counterclaims) and final resolution of the Indemnified CP Litigation Matter and (ii) until the Privacy Litigation Assumption Date, the Shareholders' Representative will assume primary responsibility and control of the defense, prosecution (if applicable with respect to any counterclaims) and final resolution of the Indemnified Privacy Litigation Matter (the Indemnified CP Litigation Matter and the Indemnified Privacy Litigation Matter are collectively referred to as the "Indemnified Litigation Matters"), in each case, subject to the terms and conditions set forth in this Section 6.11. As used herein, the terms "CP Litigation Assumption Date" shall mean the date that is the earlier of (A) the date that is six months after the Closing Date or (B) the date after the Closing Date on which the Company (or the Surviving Corporation as successor) has been formally called by the applicable court to trial for a date certain in connection with the Indemnified CP Litigation Matter (or, if such date occurs prior to the Closing Date, then on the Closing Date); and "Privacy Litigation Assumption Date" shall mean the date that is the earlier of (X) the date that is twenty-four months after the Closing Date and (Y) the date after the Closing Date on which the Company (or the Surviving Corporation as successor) has been formally called by the applicable court to trial for a date certain in connection with the Indemnified Privacy Litigation Matter (or, if such date occurs prior to the Closing Date, then on the Closing Date). Subject to Section 6.11(c), Parent shall assume primary responsibility and control of the defense, prosecution (if applicable) and final resolution of the Indemnified CP Litigation Matter on the CP Litigation Assumption Date, and of the Indemnified Privacy Litigation Matter on the Privacy Litigation Assumption Date; provided, however, that nothing contained herein shall obligate Parent to continue the prosecution of any counterclaim(s) initiated by the Shareholders' Representative in connection with either of the Indemnified Litigation Matters. Any proposed settlement of any Indemnified Litigation Matter prior to the CP Litigation Assumption Date and/or the Privacy Litigation Assumption Date, as applicable, with respect to each of the Indemnified Litigation Matters shall be effected only with the prior written consent of Parent, which consent shall not be

- 57 -

unreasonably withheld or delayed; conversely, any proposed settlement of any Indemnified Litigation Matter after the CP Litigation Assumption Date and/or the Privacy Litigation Assumption Date, as applicable, shall be effected only with the prior written consent of the Shareholders' Representative, which consent shall not be unreasonably withheld or delayed.

(b)     At all times while in control of the defense, prosecution and final resolution of the Indemnified Litigation Matters, the Shareholders' Representative will consult with Parent regarding all material decisions relating to the defense, prosecution and/or any proposed settlement or other final resolution of the applicable Indemnified Litigation Matters. At all times after the Parent assumes control of the Indemnified Litigation Matters as provided in Section 6.11(a) hereof, if applicable, Parent will consult with the Shareholders' Representative regarding all material decisions relating to the defense, prosecution and/or any proposed settlement or other final resolution of the applicable Indemnified Litigation Matter. In connection with any determination regarding whether either of the Indemnified Litigation Matters is to be settled after the CP Litigation Assumption Date and/or the Privacy Litigation Assumption Date, as applicable, Parent shall only agree to settle such matter prior to a final resolution by trial on the merits if, based on the advice and opinion of counsel, such a settlement is recommended in light of, and after reasonable consideration of, the probability of success on the merits, the anticipated damages and other losses to be incurred or suffered in the event of an adverse judgment and the anticipated costs and expenses associated with the continued pursuit of the applicable litigation. Parent and the Shareholders' Representative will at all times prior to the CP Litigation Indemnification Escrow Termination Date and the Privacy Litigation Indemnification Escrow Termination Date, as applicable, in good faith cooperate in the defense, prosecution (if applicable with respect to any counterclaims), settlement or other final resolution of the Indemnified Litigation Matters and shall, if requested by the other party, exercise its reasonable best efforts to attend the applicable trial(s) and/or settlement conferences or meetings coordinated by the party in control of such litigation as provided herein. If either Parent or the Shareholders' Representative is unable for any reason to attend any such settlement conferences or meetings, such party shall in good faith exercise its reasonable best efforts to specify in writing to the other party hereto the settlement terms that would be acceptable to such party prior to the scheduled date of any such conference or meeting, or otherwise appoint an authorized designee for purposes of attending such meeting(s) on behalf of such party.

(c)     Subject to the provisions of the Escrow Agreement, the Shareholders' Representative shall fund and pay from the Escrow Fund all Losses (including all costs and reasonable attorneys fees) incurred by any of the Acquired Companies (or the Surviving Corporation as successor) in connection with the defense, prosecution and final resolution of the Indemnified Litigation Matters after the Closing Date and prior to the CP Litigation Assumption Date and Privacy Litigation Assumption Date, as applicable. All such Losses incurred (i) from or in connection with the Indemnified CP Litigation Matter shall be paid for and funded solely from the CP Litigation Indemnification Escrow, and (ii) from or in connection with the Indemnified Privacy Litigation Matter shall be paid for and funded solely from the Privacy

- 58 -

Litigation Indemnification Escrow in each case as and to the extent provided in Article VIII hereof. The Shareholders Representative shall submit draw requests, together with appropriate invoices or other reasonably adequate supporting documentation, in accordance with the terms of the Escrow Agreement in connection with its payment of such costs and expenses as they are incurred. In the event that the CP Indemnified Litigation Matter is not finally resolved on the CP Litigation Assumption Date, subject to Section 6.11(e) hereof, the Shareholders' Representative shall arrange for the payment from the CP Litigation Indemnification Escrow to the applicable parties of all costs and expenses incurred in connection with the defense of the CP Indemnified Litigation Matter through and including such date. From and after the CP Litigation Assumption Date and the Privacy Litigation Assumption Date, as applicable, Parent shall bear all costs and expenses associated with the defense, prosecution and final resolution of such matters, and shall be entitled to fund and pay from the Escrow Fund all Losses (including all costs and reasonable attorneys fees) incurred in connection therewith, in each case as and to the extent provided in Article VIII hereof; provided, however, that nothing contained herein shall obligate Parent to pursue any counterclaims initiated by the Shareholders' Representative in connection with any of the Indemnified Litigation Matters.

      (d)    From and after the Closing Date, and until the CP Litigation Assumption Date, the Shareholders' Representative shall also assume primary responsibility and control of the prosecution of the Company's claims asserted against ChoicePoint, Inc. and its affiliates in connection with the following litigation (the "Choicepoint Claims"): Seisint, Inc., a Florida corporation v. National Data Retrieval, Inc., a Georgia corporation, ChoicePoint Public Records, Inc., a Georgia corporation, ChoicePoint, Inc., a Georgia corporation, Douglas C. Curling and J. Michael De Janes, Circuit Court Palm Beach County, Florida, Case No. CA03-00184AO. The Shareholders' Representative shall be entitled to fund and pay from the Escrow Fund the costs and expenses (including reasonable attorneys fees) incurred by the Acquired Companies (or the Surviving Corporation as successor) in connection with the prosecution of the ChoicePoint Claims. At all times while in control of the prosecution and final resolution of the ChoicePoint Claims, the Shareholders' Representative will consult with Parent regarding all material decisions relating to the prosecution and/or any proposed settlement or other final resolution of the ChoicePoint Claims. After the CP Litigation Assumption Date, Parent shall not be obligated to continue the prosecution of the ChoicePoint Claims and shall be entitled to settle such claims on the terms as Parent may determine in its sole discretion. In the event that any of the Acquired Companies (or the Surviving Corporation as successor) (i) receives an award of damages and/or attorneys fees, costs or expenses that is actually paid in connection with the prosecution of the ChoicePoint Claims or any counterclaim(s) asserted in connection with the Indemnified CP Litigation Matter and/or (ii) receives any amounts in connection with the settlement of any of the ChoicePoint Claims or the counterclaim(s) initiated by the Shareholders' Representative in connection with the Indemnified CP Litigation Matter, the amount of such recovery and/or settlement amount, as applicable, shall be applied to offset the amount of any Losses recoverable by Parent pursuant to Section 8.2(b)(i) hereof. In the event that any of the Acquired Companies (or the Surviving Corporation as successor) receives an award of attorneys fees, costs or

- 59 -

expenses that is actually paid in connection with the defense of either of the Indemnified Litigation Matters, the amount of such recovery shall be applied to offset the amount of any Losses recoverable by Parent pursuant to Section 8.2(b)(i) or 8.2(b)(ii), as applicable.

(e)     As soon as practicable prior to the CP Litigation Assumption Date and/or the Privacy Litigation Assumption Date, as applicable, the Shareholders Representative shall coordinate with Parent to arrange for the orderly assumption by Parent of primary responsibility and control of (i) the defense and final resolution of the applicable Indemnified Litigation Matter, and (ii) the prosecution and final resolution of the ChoicePoint Claims.

(f)     In the event that the escrow funds deposited in either of the CP Litigation Indemnification Escrow or the Privacy Litigation Escrow are at any time less than the sum of (i) the costs and expenses incurred and paid (or reasonably anticipated to be paid) by the Shareholders' Representative in connection with the defense of the applicable Indemnified Litigation Matter and (ii) the amount of any adverse judgment(s) entered against any of the Acquired Companies (irrespective of whether an appeal of such judgment is pending or may be pursued by Parent on behalf of any of the Acquired Companies) (an "Escrow Shortfall"), then the Shareholders Representative shall promptly coordinate with Parent to arrange for the orderly assumption by Parent of control of the defense of the applicable Indemnified Litigation Matter as promptly as practicable after such Escrow Shortfall determination. Upon a determination that an Escrow Shortfall exists with regard to either of the Indemnified Litigation Matters, subject to the provisions of Article VIII hereof, Parent shall assume full control of, and shall bear all costs and expenses associated with, the defense and final resolution of the Indemnified Litigation Matter until the final resolution thereof.

(g)     Neither Parent nor the Shareholders' Representative will be entitled to change or substitute trial counsel of record for the Acquired Companies (or the Surviving Corporation as successor) in connection with either of the Indemnified Litigation Matters without the prior written consent of the other party.

Section 6.12    Acquisition Proposals.

(a)     Company agrees that, during the term of this Agreement, none of it, any of its Subsidiaries or Affiliates, any of the respective directors, officers, employees, agents or representatives of the foregoing, will, directly or indirectly, (i) solicit, initiate or encourage (including by way of furnishing or disclosing non-public information) any inquiries or the making of any proposal with respect to any merger, consolidation or other business combination involving Company or any Subsidiary of Company, the acquisition of all or any significant part of the assets or capital stock of Company or any Subsidiary of Company (an "Acquisition Transaction") or (ii) negotiate or otherwise engage in discussions with any Person (other than Parent and its representatives) with respect to any Acquisition Transaction, or enter into any written agreement, arrangement or understanding with respect to any such Acquisition Transaction; provided, however, that Company may, in response to an unsolicited written

- 60 -

proposal from a third party regarding a Superior Proposal (as hereinafter defined). furnish information to (except that the Company shall not furnish or disclose to any third party information relating to this Agreement and/or the terms set forth herein) and engage in discussions and negotiations with such third party. but only if the Board of Directors of Company determines in good faith. after consultation with its financial advisors and based upon the advice of counsel. that failing to take such action could result in a breach of the fiduciary duties of such Board of Directors under applicable Law.

(b)     Company agrees that. as of the date hereof. except as expressly provided in Section 6.12(a) hereof. it. its Subsidiaries and Affiliates. and the respective directors. officers. employees. agents and representatives of the foregoing. shall immediately cease and cause to be terminated any existing activities. discussions or negotiations with any Person (other than Parent and its representatives) conducted heretofore with respect to any Acquisition Transaction. Company agrees to promptly advise Parent in writing of the existence of (x) any inquiries or proposals received by. any such information requested from. or any negotiations or discussions sought to be initiated or continued with. Company. its Subsidiaries or Affiliates. or any of the respective directors. officers. employees. agents or representatives of the foregoing. in each case from a Person (other than Parent and its representatives) with respect to an Acquisition Transaction. and (y) the terms thereof. including the identity of such third party and the terms of any financing arrangement or commitment in connection with such Acquisition Transaction. and to update on an ongoing basis or upon Parent's reasonable request. the status thereof.  As used herein. "Superior Proposal" means a *bona fide*. written and unsolicited proposal or offer made by any Person (or group other than Parent or any of its Subsidiaries) with respect to an Acquisition Transaction on terms which. as determined by the Board of Directors of Company in good faith and in the exercise of reasonable judgment (based on the advice of independent financial advisors and legal counsel). is at a higher price and more favorable to Company and the Company Shareholders than the transactions contemplated hereby.

## ARTICLE VII

## CONDITIONS PRECEDENT TO CONSUMMATION OF THE MERGER

Section 7.1     Conditions Precedent to Obligations of Each Party.

The obligations of each party to consummate the Merger are subject to the satisfaction or waiver at or prior to the Effective Time of the following conditions precedent:

(a)     The shareholders of the Company shall have approved the Plan of Merger and the transactions contemplated hereby. as and to the extent required by the FBCA or other applicable Law. and by the provisions of any governing instruments.

- 61 -

(b)     The waiting period applicable to the consummation of the Merger under the HSR Act, and if applicable under any foreign competition law, shall have expired or been terminated, or approval of the relevant Government Authority otherwise obtained.

(c)     No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the Merger shall have been issued by any court of competent jurisdiction or any other Governmental Authority and shall remain in effect, and there shall not be any Law, action or proceeding enacted, promulgated, adopted or deemed applicable to the Merger that makes consummation of the Merger illegal or otherwise prohibits or interferes with the consummation of the Merger.

(c)     The period of time permitted under Section 607.1320 of the FBCA, during which the shareholders of the Company may demand the appraisal of their shares of the Company capital stock, shall have expired.

(d)     The parties shall have received written notice from CFIUS that review of the Merger and related transactions under the Exon-Florio Amendment has been concluded; and CFIUS shall have determined that there are no issues of national security sufficient to warrant investigation under the Exon-Florio Amendment and advised that action under the Exon-Florio Amendment has been concluded with respect to the Merger and related transactions.

Section 7.2     Conditions Precedent to Obligations of Parent and Merger Subsidiary.

The obligations of Parent and Merger Subsidiary to consummate the Merger are subject to the satisfaction or waiver at or prior to the Effective Time of the following conditions precedent:

(a)     The representations and warranties of the Company contained in this Agreement that are qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects on the Closing Date as though then made, except to the extent such representations and warranties relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, as those not so qualified shall be true and correct in all material respects, on and as of such earlier date), and Parent shall have received a certificate to that effect dated the Closing Date and executed on behalf of Company by an authorized officer of Company.

(b)     Each of the covenants, agreements and obligations of Company to be performed at or before the Effective Time pursuant to the terms of this Agreement shall have been duly performed in all material respects at or before the Effective Time, and Company shall have delivered to Parent a certificate to that effect dated the Closing Date and executed on behalf of Company by an authorized officer of Company.

- 62 -

(c)     Parent shall have received the resignations of each of the Persons described in Schedule 7.2(c) hereto.

(d)     Appraisal rights shall not have been properly demanded by the Company Shareholders pursuant to Section 607.1320 of the FBCA for shares of the Company Common Stock and Company Preferred Stock in a number greater than ten percent (10°₀) of the Company Common Stock and Company Preferred Stock (on a fully diluted basis) issued and outstanding immediately prior to the Effective Time.

(e)     Parent shall have received the legal opinion of Hunton & Williams LLP. counsel to the Company. in form and substance reasonably acceptable to Parent and its counsel.

(f)     The Company shall have received and delivered to Parent the third-party consents listed on Schedule 7.2(f).

Section 7.3     Conditions Precedent to Obligations of Company.

The obligations of Company to consummate the Merger are subject to the satisfaction or waiver at or prior to the Effective Time of the following conditions precedent:

(a)     The representations and warranties of Parent and Merger Subsidiary contained in this Agreement that are qualified as to materiality shall be true and correct. and those not so qualified shall be true and correct in all material respects on the Closing Date as though then made. except to the extent such representations and warranties relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, as those not so qualified shall be true and correct in all material respects. on and as of such earlier date). and Company shall have received a certificate to that effect dated the Closing Date and executed on behalf of Parent by an authorized officer of Parent.

(b)     Each of the covenants. agreements and obligations of Parent and Merger Subsidiary to be performed at or before the Effective Time pursuant to the terms of this Agreement shall have been duly performed in all material respects at or before the Effective Time. and Parent and Merger Subsidiary shall have delivered to Company a certificate to that effect dated the Closing Date and executed on behalf of Parent and Merger Subsidiary by an authorized officer of each of Parent and Merger Subsidiary.

(c)     Company and the Shareholders Representative (on behalf of the Company Shareholders) shall have received the legal opinion of Paul Hastings Janofsky & Walker LLP. counsel to Parent. in form and substance reasonably acceptable to Company and its counsel.

(d)     Parent shall have paid the Closing Date Acquisition Amount in accordance with Section 2.7.

- 63 -

# ARTICLE VIII

## SURVIVAL; INDEMNIFICATION

Section 8.1    Limitation on, and Survival of Representations and Warranties.

(a)    Parent and Merger Subsidiary acknowledge and agree that no representations or warranties have been made by Company or the Company Shareholders in connection with the transactions contemplated by this Agreement except for those made by Company expressly set forth herein. Except to the extent provided in Section 8.2(a) hereof. Parent and Merger Subsidiary agree, on behalf of themselves as well as the Surviving Corporation, not to assert any claim that Company or any Company Shareholder has made any false representation, warranty or statement in connection with the transactions contemplated by this Agreement or omitted to make any statement necessary in order to make the representations, warranties and statements so made by Company not misleading and agree to waive any right or remedy available by Law in connection with the foregoing.

(b)    Subject to paragraph (a) of this Section 8.1, and except as provided in Sections 8.1(c) hereof with respect to the matters referenced therein, any party's remedy for a breach of any representation or warranty contained in Article III or Article IV of this Agreement, or in any agreements or instruments executed in connection herewith or delivered pursuant hereto, shall survive for a period expiring on the first anniversary of the Closing Date, but no longer, and shall only be effective with respect to any breach or claim when notice of such breach or claim shall have been given in writing to the other party in breach or against whom indemnification is sought within such period prescribed.   Any claim for indemnification for which notice has been given within the prescribed period may be prosecuted to conclusion notwithstanding the subsequent expiration of such period.  No party to this Agreement shall be entitled to pursue any remedy for the breach of any representation or warranty to the extent such party was aware of such breach prior to the Closing Date and such party proceeds with the Closing.

(c)    The indemnity furnished to Parent (i) pursuant to Section 8.2(b)(i), with respect to the Indemnified CP Litigation Matter, shall survive until the CP Litigation Indemnification Escrow Termination Date; (ii) pursuant to Section 8.2(b)(ii), with respect to the Indemnified Privacy Litigation Matter, shall survive until the Privacy Litigation Indemnification Escrow Termination Date; and (iii) pursuant to Section 8.2(c), with respect to the Indemnified Company Option Matter, shall survive until the date that is thirty (30) days after the expiration of the applicable statute of limitations regarding the matter(s) described therein.

- 64 -

Section 8.2    Indemnification by Company.

Subject to the limitations set forth in Sections 8.1. 8.4 and 8.8 hereof. Company hereby agrees to indemnify and hold harmless Parent. Merger Subsidiary and the Surviving Corporation (the "Parent Indemnified Parties") from and against:

(a)    any and all claims. demands. suits. proceedings. judgments. losses. liabilities. damages. costs and expenses of every kind and nature (including. but not limited to. reasonable attorneys' fees) and settlements authorized in accordance with Section 6.11 hereof (collectively. "Losses") imposed upon or incurred by any Parent Indemnified Party after the Effective Time. (collectively. a "Parent Claim") as a result of or in connection with any of the following:

(i)    A breach of any representation or warranty made by Company under Article III of this Agreement: or

(ii)    The breach of or default in the performance by Company of any covenant. agreement or obligation to be performed by Company pursuant to this Agreement or any agreement or instrument executed in connection herewith or pursuant hereto: or

(b)    Subject to Section 6.11. any Losses imposed on. or required to be paid by. any Acquired Company in connection with the following litigation matters:

(i)    ChoicePoint Public Records. Inc. v. Henry Edward Asher and Seisint. Inc.. Circuit Court Palm Beach County. Florida – 01-09260 (filed September 10. 2001 (the "Indemnified CP Litigation Matter"): and

(ii)    Richard Fresco. et. al. v. Automotive Directions. Inc.. et. al.. United States District Court for the Southern District of Florida – 03-61063 (filed May 30. 2003) (the "Indemnified Privacy Litigation Matter"):

:provided. however. that for purposes of this Section 8.2(b). the term "Losses" shall not include in the case of the Indemnified Privacy Litigation Matter. amounts paid or payable by Parent or any of its Affiliates (other than any of the Acquired Companies) as a result of its own involvement and exposure as a party defendant in such litigation prior to the date hereof.

(c)    Any Losses imposed upon or incurred by any Parent Indemnified Party after the Effective Time as a result of or in connection with the failure. or alleged failure. by the Company to properly issue the Company Options (being approximately 49.375 Company Options) referenced in the final paragraph of Part B of Schedule 3.2(d) hereof (the "Indemnified Company Option Matter").

- 65 -

Section 8.3    Indemnification by Buyer.

Subject to the limitations set forth in Sections 8.1, 8.4, and 8.8 hereof, Parent and the Surviving Corporation hereby jointly and severally agree to indemnify and hold Company and each Company Shareholder (collectively the "Company Indemnified Parties") harmless from and against any and all Losses imposed upon or incurred by Company or any Company Shareholder (any of such losses, a "Company Claim"), as a result of or in connection with any of the following:

(a)    A breach of any representation or warranty made by Parent or Merger Subsidiary under Article IV of this Agreement;

(b)    The breach of or default in the performance by Parent or Merger Subsidiary of any covenant, agreement or obligation to be performed by Parent or Merger Subsidiary pursuant to this Agreement or any agreement or instrument executed in connection herewith or pursuant hereto; or

(c)    Liabilities and obligations arising out of the conduct of the business of the Company and the Acquired Subsidiaries after the Effective Time; provided, however, that following the Effective Time, Company shall not be considered a Company Indemnified Party and may not assert any claim for indemnification after the Effective Time.

Section 8.4    Limitation of Liability.

(a)    General Indemnification.

Company shall not have any liability to indemnify the Parent Indemnified Parties in respect of Losses incurred by any Parent Indemnified Party pursuant to Section 8.2(a), and the Parent Indemnified Parties shall not have any liability to indemnify the Company Indemnified Parties in respect of Losses incurred by Company or any Company Shareholder pursuant to Section 8.3, in either case unless and until the aggregate amount of such Losses exceeds $3,750,000 (the "Threshold Amount"), in which event the party seeking indemnity may recover the full amount of such Losses, other than the Threshold Amount, provided that (i) in the event of a breach by the Company of the representations set forth in Section 3.8(b) regarding the Acquired Companies' Available Cash at Closing, the Company shall not have any liability to indemnify the Parent Indemnified Parties in respect of Losses incurred by any Parent Indemnified Party as a result thereof unless and until the aggregate amount of such Losses exceeds $250,000 in which event the party seeking indemnity may recover the full amount of such Losses, (ii) recovery by the Parent Indemnified Parties in respect of all Losses under or pursuant to Section 8.2(a), shall be limited to the General Indemnification Escrow and (iii) recovery by the Company Indemnified Parties in respect of all Losses shall be limited to $32,000,000. The General Indemnification Escrow portion of the Escrow Fund shall be the sole

- 66 -

and exclusive source of funds for satisfaction of all Losses of the Parent Indemnified Parties under or pursuant to Section 8.2(a).

(b)     Indemnified Litigation Matters.

(i)     Recovery by the Parent Indemnified Parties in respect of all Losses under or pursuant to Section 8.2(b)(i) shall be limited to the CP Litigation Indemnification Escrow; and. the CP Litigation Indemnification Escrow portion of the Escrow Fund shall be the sole and exclusive source of funds for satisfaction of all Losses of the Parent Indemnified Parties under or pursuant to Section 8.2(b)(i). The Threshold Amount (or any other deductible or threshold) shall not apply to the recovery of Losses under Section 8.2(b)(i).

(ii)     Recovery by the Parent Indemnified Parties in respect of all Losses under or pursuant to Section 8.2(b)(ii) shall be limited to the Privacy Litigation Indemnification Escrow; and the Privacy Litigation Indemnification Escrow portion of the Escrow Fund shall be the sole and exclusive source of funds for satisfaction of all Losses of the Parent Indemnified Parties under or pursuant to Section 8.2(b)(ii). The Threshold Amount (or any other deductible or threshold) shall not apply to the recovery of Losses under Section 8.2(b)(ii).

(c)     Indemnified Company Option Matter.

Recovery by the Parent Indemnified Parties in respect of all Losses under or pursuant to Section 8.2(c) shall be limited to the General Indemnification Escrow; and the General Indemnification Escrow portion of the Escrow Fund shall be the sole and exclusive source of funds for satisfaction of all Losses of the Parent Indemnified Parties under or pursuant to Section 8.2(c). The Threshold Amount (or any other deductible threshold) shall not apply to the recovery of Losses under Section 8.2(c).

(d)     No Company Shareholder Liability.

No Company Shareholder shall have any liability to the Parent Indemnified Parties in connection with this Agreement or the transactions contemplated hereby as Parent Indemnified Parties' sole and exclusive source for recovery of any and all Losses shall be the Escrow Fund. and only to the extent of the amounts provided for therein.

Section 8.5     Notice of Indemnity Claims.

If a party intends to assert a Parent Claim or a Company Claim (a Parent Claim or a Company Claim being hereafter referred to as an "Indemnity Claim" in this Section 8.5), the party intending to assert an Indemnity Claim shall provide the party from whom indemnification is sought with notice of such Indemnity Claim within 30 days after receiving notice of such Indemnity Claim. In the case of a Parent Claim, Parent shall provide to the Escrow Agent and to the Shareholders Representative such notices as are required under the provisions of the Escrow

- 67 -

Agreement. At the time the Indemnity Claim is made and thereafter, any party asserting the Indemnity Claim shall provide the party against which the Indemnity Claim is asserted with copies of any materials in its possession describing the facts or containing information providing the basis for the Indemnity Claim. If the Indemnity Claim involves a claim by a third party (a "Third Party Indemnity Claim"), the party against which the Third Party Indemnity Claim is asserted may assume at its expense the defense of the claim by the third party, provided that such party against which the Third Party Indemnity Claim is asserted agrees in writing with respect to such Third Party Indemnity Claim that it is obligated hereunder to indemnify and hold any party asserting the Third Party Indemnity Claim harmless in accordance with the terms of this Article VIII; and *provided. further*, that the party asserting the Third Party Indemnity Claim shall be entitled to participate in the defense of such claim at its own expense. The failure of any party against which the Third Party Indemnity Claim is asserted to assume the defense of any such claim shall not affect any indemnification obligation under this Agreement. In connection with the defense of any Third Party Indemnity Claim (including any litigation matter described in Section 6.11 and Section 8.2(b) hereof), the party entitled to indemnification shall not, except with the prior written consent of the party from whom indemnification is sought, which consent shall not be unreasonably withheld, consent to entry of any judgment, admit any liability or enter into any settlement, compromise or discharge of such claim.

Section 8.6    Shareholders' Representative.

(a)    By approving the Merger, each of the Company Shareholders (other than the holders of Dissenting Shares) shall have appointed Morris C. Brown, c/o Greenberg Traurig, P.A., 777 South Flagler Drive, Suite 300 East, West Palm Beach, Florida 33401, as the Shareholders' Representative to act as the agent of the Company Shareholders with the full power (i) to resolve all questions, disputes, conflicts and controversies concerning Company Claims, Parent Claims and the Indemnified Litigation Matters as provided in Section 6.11 hereof, (ii) to authorize the payments of amounts held under the Escrow Agreement in connection with Parent Claims and the Indemnified Litigation Matters as provided herein, (iii) to negotiate and/or settle such claims, (iv) to take such actions and execute such documents on the Company Shareholders' behalf in connection with Section 6.11 and Article VIII of this Agreement, and the Escrow Agreement, as the Shareholders' Representative, in its sole discretion, deems proper and (v) to perform all of the functions of the Shareholders' Representative under this Agreement and the Escrow Agreement. Parent, Merger Subsidiary and the Escrow Agent are entitled to rely on the acts and agreements of the Shareholders' Representative as the acts and agreements of the Company Shareholders. The Shareholders' Representative shall be entitled to retain counsel and to incur such reasonable expenses (including court costs and reasonable attorney's fees and expenses) as the Shareholders' Representative deems to be reasonably necessary or appropriate in connection with its performance of its obligations under this Agreement and the Escrow Agreement, and all such fees and expenses incurred by the Shareholders' Representative shall be borne *pro rata* by the Company Shareholders. The fees and expenses incurred by the Shareholders' Representative pursuant to this Section 8.6 shall be paid from the Escrow Fund.

- 68 -

(b)     The Escrow Shareholders hereby agree severally to indemnify the Shareholders' Representative (in his capacity as such) ratably according to (and to the extent of) their respective interests with respect to the Parent's Deferred Payment Obligations (after the payment of all Losses to Parent for which it is entitled to indemnification pursuant to Article VIII hereof) against and to hold the Shareholders' Representative (in its capacity as such) harmless from any and all liabilities. obligations. losses. damages. penalties. actions. judgments. suits. costs. expenses or disbursements of whatever kind which may at any time be imposed upon. incurred by or asserted against the Shareholders' Representative in such capacity in any way relating to or arising out of its action or failures to take action pursuant to this Agreement or the Escrow Agreement or in connection herewith or therewith in such capacity: provided. that none of the Escrow Shareholders shall be liable for any portion of such liabilities. obligations. losses. damages. penalties. actions. judgments. suits. costs. expenses or disbursements resulting solely from the gross negligence or willful misconduct of the Shareholders' Representative.     The agreements in this Section 8.6 shall survive termination of this Agreement and the Escrow Agreement. The Shareholders' Representative shall not be entitled to pursue any claims against Parent or the Surviving Corporation. and neither Parent nor the Surviving Corporation shall have any liability to the Shareholders' Representative. pursuant to this Section 8.6.

Section 8.7     Arbitration.

If any dispute should arise between the parties hereto as to any matter covered by this Agreement. including any claim for indemnification pursuant to Section 8.2. 8.3 or with respect to any dispute arising pursuant to the Escrow Agreement. then. in lieu of any suit or action in regard to any such matter. the controversy shall be submitted to arbitration in the following manner:

The party desiring to submit such controversy to arbitration shall give to the other party notice in writing. stating with specificity the matter upon which an award is desired and naming the arbitrator selected by such party. Within 10 days following the receipt of such notice. the other party shall give written notice to the party desiring such arbitration of the arbitrator selected by it.   Thereafter. the two arbitrators so chosen shall select a third.   If such two arbitrators are unable to agree upon a third arbitrator within 20 days from the naming of the second arbitrator. the third arbitrator shall be appointed. upon application of either of the parties hereto. by the United States District Court for the Southern District of Florida.  The arbitrators thus chosen shall give to each of the parties hereto written notice of the time and place of hearing. which hearing shall be held not less than 10 days. nor more than 20 days. after the selection of the third arbitrator. and at the time and place appointed. and shall proceed with the hearing unless for some good cause. of which a majority of the arbitrators shall be the judge. it shall be postponed until some other day within a reasonable time.  The parties hereto shall have full opportunity to be heard on any question thus submitted. and the determination by a majority of the arbitrators shall be made in writing and a copy thereof delivered to each of the parties hereto. The arbitrators shall in every case deliver their decision within 60 days after the hearing.

- 69 -

unless the parties shall otherwise agree to extend the time. The arbitrators, as a part of their decision and award, shall decide the amount of the costs of arbitration and by whom they shall be borne and paid.

Section 8.8    Indemnity Amounts to be Computed on After-Tax Basis.

The amount of any indemnification payable under Section 8.2 or 8.3 of this Article VIII shall be (i) net of any federal or state income tax benefit realized or the then-present value (based on a discount rate of 5%) of any such income tax benefit to be realized by the indemnified party (or, where Parent is the indemnified party, the Surviving Corporation or the Company or any of the Acquired Subsidiaries) by reason of the facts and circumstances giving rise to the indemnification, and (ii) increased by the amount of any federal or state income tax required to be paid by the indemnified party on the accrual or receipt of the indemnification payment. For purposes of the preceding sentence, the amount of any state income tax benefit or cost shall take into account the federal income tax effect of such benefit or cost.

## ARTICLE IX

## TERMINATION; AMENDMENT; WAIVER

Section 9.1    Termination.

This Agreement may be terminated and the Merger contemplated hereby may be abandoned at any time prior to the Effective Time, notwithstanding approval of the Plan of Merger and the transactions contemplated hereby by the shareholders of Company:

(a)    by mutual written consent of Company and Parent;

(b)    by either Parent or Company:

(i)    if any court of competent jurisdiction or any Governmental Authority shall have issued an order, decree or ruling or taken any other action permanently enjoining, restraining or otherwise prohibiting the Merger; or

(ii)    if the Merger shall not have been consummated on or before December 31, 2004, unless the failure to consummate the Merger is the result of a material breach of this Agreement by the party seeking to terminate this Agreement;

(c)    by Parent, if (i) Company breaches in any material respect any of its representations or warranties herein or fails to perform in any material respect any of its covenants, agreements or obligations under this Agreement, which breach has not been cured within 30 days following receipt by Company of notice of breach or by the date specified in Section 9.1(b)(ii) or (ii) holders of a majority of the outstanding shares of Company Common

- 70 -

Stock and Company Preferred Stock have not approved the Merger within thirteen (13) business days after the date hereof; and

(d)     by Company. if based on the advice of legal counsel to Company that such action is necessary in order for the Board of Directors of Company to ensure compliance with its fiduciary duties under applicable Law. subject to complying with the terms of this Agreement. (i) the Board of Directors of the Company at any time prior to the date specified in Section 9.1(b)(ii) withdraws its recommendation to the Company Shareholders that the Merger be approved by such Company Shareholders and/or (ii) (A) the Company enters into a binding written agreement concerning a transaction that constitutes a Superior Proposal and Company notifies Parent in writing that it intends to enter into such an agreement. attaching the most current version of such agreement to such notice. (B) Parent does not make. within ten business days of receipt of the Company's written notification of its intention to enter into a binding agreement for a Superior Proposal. an offer to enter into an amendment to this Agreement such that the Board of Directors of Company determines. in good faith after consultation with its financial advisors and legal counsel. that this Agreement as so amended is at least as favorable. including from a financial point of view. to the Company Shareholders as the Superior Proposal and (C) Company prior to such termination pays to Parent in immediately available funds any fees required to be paid pursuant to Section 9.3(a). Company agrees (x) that it will not enter into a binding agreement referred to in clause (A) above until at least the eleventh business day after it has provided the notice to Parent required thereby and (y) to notify Parent promptly if its intention to enter into a written agreement referred to in its notification shall change at any time after giving such notification: or by Company. if Parent breaches in any material respect any of its representations or warranties herein or fails to perform in any material respect any of its covenants. agreements or obligations under this Agreement. which breach has not been cured within 30 days following receipt by Parent of notice of breach or by the date specified in Section 9.1(b)(ii).

Section 9.2     Effect of Termination.

If this Agreement is so terminated and the Merger is not consummated. this Agreement shall forthwith become void and shall have no further force or effect other than the confidentiality provisions of Section 6.1 and the provisions of Sections 6.4. 6.5. and 9.2 and Article X: *provided.* that nothing contained in this Section 9.2 shall relieve any party from liability for any material breach of any representation. warranty. covenant or agreement contained in this Agreement.

Section 9.3     Termination Fee Payable to Parent: Expense Reimbursement

(a)     Notwithstanding any provision to the contrary contained herein. Company shall immediately pay to Parent (x) the amount of $23.250.000 and (y) all reasonably documented out-of-pocket expenses actually and reasonably incurred by Parent in connection with this Agreement and the Merger if this Agreement is terminated pursuant to Section 9.1(d).    The

- 71 -

amount in (x) above shall be paid concurrently with any such termination and the amount in (y) above shall be paid within five (5) business days after receipt by Company of reasonably detailed evidence of the same. Upon receipt of such payments. Parent shall not be entitled to and shall waive the right to seek damages or other amounts or remedies from Company for breach of. or otherwise in connection with. this Agreement.

(b)    Notwithstanding any provision to the contrary contained herein. Company shall pay to Parent all reasonable documented. out of pocket expenses actually and reasonably incurred by Parent in connection with this Agreement and the Merger. up to a maximum of $250.000. if this Agreement is terminated by Parent pursuant to Section 9.1(c)(ii). Such amount shall be paid within five (5) business days after receipt by Company of reasonably detailed evidence of the same. Upon receipt of such payment. Parent shall not be entitled to and shall waive the right to seek damages or other amounts or remedies from Company for breach of. or otherwise in connection with. this Agreement.

Section 9.4    Amendment.

This Agreement and the Plan of Merger may be amended by action taken by Merger Subsidiary. Company and Parent at any time before the Effective Time; *provided. however. that* no amendment shall be made that under applicable Law requires the approval of the Company's shareholders without the approval of such shareholders. This Agreement may not be amended except by an instrument in writing signed on behalf of both of the parties hereto.

Section 9.5    Extension: Waiver.

At any time prior to the Effective Time. either party hereto may. to the extent legally allowed. (i) extend the time for the performance of any of the obligations or other acts of the other party hereto. (ii) waive any inaccuracies in the representations and warranties contained herein or in any document. certificate or writing delivered pursuant hereto by the other party hereto or (iii) waive compliance with any of the agreements or conditions contained herein by the other party hereto. Any agreement on the part of any party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party. The failure of any party hereto to assert any of its rights hereunder shall not constitute a waiver of such rights.

# ARTICLE X

## MISCELLANEOUS

Section 10.1    Entire Agreement: Assignment.

This Agreement. the Escrow Agreement and the Confidentiality Agreement (i) constitute the entire agreement between the parties with respect to the subject matter hereof and thereof and

- 64 -

supersede all other prior agreements and understandings, both written and oral, between the parties or any of them with respect to the subject matter hereof and thereof, and (ii) shall not be assigned by operation of Law or otherwise.

Section 10.2 <u>Notices.</u>

All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by cable, telecopy, telegram or telex, overnight delivery service from a national carrier or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties as follows:

if to Company:

Seisint, Inc.
6601 Park of Commerce Blvd.
Boca Raton, FL 33487
Attention: General Counsel
Telephone: 561-999-4403
Telecopy: 561-999-4496

with a copy to:

Hunton & Williams LLP
1111 Brickell Avenue
Suite 2500
Miami, Florida 33131
Attention:    Fernando C. Alonso
              Enrique J. Martin
Telephone:    (305) 810-2500
Telecopy:     (305) 810-2460

if to Parent or Merger Subsidiary:

Reed Elsevier Inc.
125 Park Avenue, 23rd Floor
New York, New York 10017
Attention:    Henry Z. Horbaczewski
              Senior Vice President and General Counsel
Telephone:    (212) 309-5481
Telecopy:     (212) 309-5487

- 65 -

with a copy to:

> LexisNexis
> 9443 Springboro Pike
> Miamisburg. Ohio 45342
> Attention:     Michael A. Jacobs
>                Senior Vice President and General Counsel
> Telephone:     (937) 865-7068
> Telecopy:      (937) 865-1211

and a copy to:

> Paul Hastings Janofsky & Walker LLP
> 600 Peachtree Street N.E.
> Suite 2400
> Atlanta. Georgia 30308
> Attention:     Paul J. Connell
> Telephone:     (404) 815-2200
> Telecopy:      (404) 815-2350

if to Shareholders' Representative:

> Greenberg Traurig. P.A.
> 777 South Flagler Street
> Suite 300 East
> West Palm Beach. Florida 33401
> Attention:     Morris C. Brown
> Telephone:     (561) 650-7900
> Telecopy:      (561) 655-6222

or to such other address as the person to whom notice is given may have previously furnished to the others in writing in the manner set forth above.

Section 10.3    Governing Law.

This Agreement shall be governed by and construed in accordance with the Laws of the State of Florida regardless of the Laws that might otherwise govern under applicable principles of conflicts of Laws thereof.

Section 10.4    Descriptive Headings.

The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

- 66 -

Section 10.5    Parties in Interest.

This Agreement shall be binding upon and inure solely to the benefit of each party hereto, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement.

Section 10.6    Execution of this Agreement.

This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by facsimile transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

Section 10.7    Severability.

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.


[SIGNATURE PAGE FOLLOWS]


- 67 -

IN WITNESS WHEREOF, each of the parties has caused this Agreement of Merger to be duly executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

REED ELSEVIER INC.

By: _____

    Name:    Kurt P. Sanford
    Title:    Executive Vice President

LNS ACQUISITION CORP.

By: _____

    Name:    Kurt P. Sanford
    Title:    President

SEISINT, INC.

By: _____

    Name:
    Title:

SHAREHOLDERS' REPRESENTATIVE

By: _____

    Name:    Morris C. Brown

- 68 -

IN WITNESS WHEREOF, each of the parties has caused this Agreement of Merger to be duly executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

REED ELSEVIER INC.

By: _____
     Name:
     Title:

LNS ACQUISITION CORP.

By: _____
     Name:
     Title:

SEISINT, INC.

By: _Paul S Cameron_
     Name: Paul S Cameron
     Title: President

SHAREHOLDERS' REPRESENTATIVE

By: _____
     Name:

- 68 -

IN WITNESS WHEREOF, each of the parties has caused this Agreement of Merger to be duly executed on its behalf by its officers thereunto duly authorized, all as of the day and year first above written.

REED ELSEVIER INC.

By: _____
     Name:
     Title:

LNS ACQUISITION CORP.

By: _____
     Name:
     Title:

SEISINT, INC.

By: _____
     Name:
     Title:

SHAREHOLDERS' REPRESENTATIVE

By: _____
     Name:
        MORRIS C BROWN

°JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

Morris C. Brown,
Shareholders' Representative of Seisint, Inc.

**(b)** County of Residence of First Listed Plaintiff  Palm Beach
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Stuart H. Singer and Sashi Bach Boruchow
Boies, Schiller & Flexner LLP, 410 East Las Olas Blvd., Suite 1200
Ft. Lauderdale, Florida 33301 (954) 356-0011

## DEFENDANTS

Reed Elsevier, Inc.,
a Massachusetts corporation

County of Residence of First Listed Defendant  Middlesex
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

Attorneys (If Known)

**(d)** Check County Where Action Arose:  ☐ MIAMI-DADE   ☐ MONROE   ☐ BROWARD   ☑ PALM BEACH   ☐ MARTIN   ☐ ST. LUCIE   ☐ INDIAN RIVER   ☐ OKEECHOBEE IGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question (U.S. Government Not a Party)

☑ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

9:08 CV 81574-KAM-Johnson

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. Security | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | ☐ 900 Appeal of Fee Determination |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State |
| | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Re-filed- (see VI below)   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):

a) Re-filed Case ☐ YES ☑ NO       b) Related Cases ☐ YES ☑ NO

JUDGE                      DOCKET NUMBER

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (**Do not cite jurisdictional statutes unless diversity**):

U.S. Civil Statute: 28 U.S.C. §1332    Brief Statement of Cause: Diversity/Contract Claim

LENGTH OF TRIAL via  1  days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23       DEMAND $       CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☑ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD
*Sashi B. Boruchow*

DATE
December 30, 2008

FOR OFFICE USE ONLY

AMOUNT 350.00   RECEIPT # 545066   IFP